UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 13-13032-GAO

MANEL MAUVAIS,
Petitioner,

v.

NATHALIE HERISSE,
Respondent.

OPINION AND ORDER
April 15, 2014

O'TOOLE, D.J.

The petitioner, Manel Mauvais, seeks an order for the return of his two minor children to Canada pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, and its implementing statute, the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-11610. After a bench trial and on consideration of the parties' submissions, I conclude that the petition ought to be granted and the children returned to Canada. In support of that conclusion, I make the following findings of fact and rulings of law:

## I. Findings of Fact

### A. Facts Relating to Habitual Residence

The petitioner, Manel Mauvais, and the respondent, Nathalie Herisse, are both citizens of Haiti. They entered into a romantic relationship in or around 2002, while living in Haiti. They had two children together: MM, who was born in France in December 2005, and RM, who was born in the United States in November 2009.

The evidence is not clear as to whether Mauvais and Herisse were formally married. They lived together in Haiti until September 2009, when Herisse moved to her aunt's home in Mattapan, Massachusetts, so that the baby she was expecting would be born in the United States. Mauvais and MM remained in Haiti. RM was born in Boston in November 2009. There was no evidence regarding whether Herisse intended to remain in the United States after the birth or intended to return to Haiti. After MM was born in France in 2005, Herisse returned to Haiti.

A catastrophic earthquake devastated Haiti in January 2010. Mauvais and MM moved to Quebec, Canada in February 2010, seeking "asylum" (according to Mauvais's testimony) in the wake of the deterioration of living conditions in Haiti. Herisse was still living in Massachusetts with her aunt and new infant. She applied for Temporary Protected Status in the United States, but her application was denied for incompleteness. She asked Mauvais to bring MM to Massachusetts, but he refused. It is not clear whether he legally could have done so. In turn, he urged Herisse to join him in Canada. She testified he threatened to harm MM if she did not. In March 2010, Herisse reluctantly took RM to Canada. Mauvais, Herisse, their two daughters, and two of Mauvais's children from a prior relationship lived for a while in Montreal with Mauvais's sister and her family.

In July 2010, Mauvais and Herisse moved into their own apartment with their two daughters and Mauvais's twin children. They lived together there until January 2011, when Herisse moved out, taking the children with her. The three first stayed with relatives, but in September 2011 they moved to a separate apartment in Montreal. In February or March 2012, Mauvais convinced her to allow him and his other children to move into her apartment. They apparently lived for some time thereafter, although the evidence is unclear. It is clear that the

children lived with their mother in an apartment in Montreal for about two years prior to the events that gave rise to the present petition.

MM was enrolled in and attended a primary school beginning with the 2011-2012 school year, and was enrolled for the 2013-2014 school year when she was taken by the respondent to the United States. RM was enrolled in a full time day care program between the end of April 2013 and late August 2013. Both children visited regularly with relatives, apparently on both their mother's and their father's sides. With some of the father's relatives, they regularly attended church and Sunday school. According to an aunt, they developed a "Quebecois" accent when speaking French.

In late August 2013, Mauvais consented to RM traveling to the United States for a month to live with Herisse's aunt in Mattapan, and the aunt traveled to Canada to take RM to Massachusetts. The parties' written agreement provided that RM would be returned to Canada around September 20, 2013. She was not returned as agreed. On September 13, 2013, the respondent left Canada with MM and traveled to her aunt's home in Massachusetts, where she and her two children remain at present.

B. Facts Relating to Grave Risk of Harm

The respondent testified that the petitioner frequently acted toward her in a sexually abusive manner. She further testified that he insisted on sexual activity at times and under circumstances when the children were or could have been exposed to it. The testimony was general and vague, however, and it is difficult to draw any reliable conclusions about how frequently such conduct occurred or how significant any impact on the children might have been.

She also testified that Mauvais's son, BM, who was a few years older than MM, was sexually assaultive toward her. One such incident occurred while the family was still living in

3

Haiti. According to the respondent, when she reported the incident to the petitioner, he disciplined BM by beating him with a belt. The respondent's aunt testified about a similar incident a couple of years later in Canada. There was no evidence as to what, if any, discipline was meted out to BM for that occasion.

There was other evidence from a niece of the petitioner that the children, including the older twins, all played well together and enjoyed each other.

In the fall of 2012, RM began to have some health problems, including frequent nosebleeds and weight loss. Herisse took her to various clinics but was not satisfied with the care RM received. Herisse decided that it would be best for RM, a U.S. citizen, to return to the U.S. to receive medical care. For that purpose, the parties agreed that Herisse's aunt could bring RM to the U.S. in late August 2013, as described above. Medical records from the Boston Medical Center in evidence indicate no major health issues. In the fall of 2013, RM was examined and treated for eczema, a tendency to experience nosebleeds, and mild anemia. For the latter, she was prescribed an iron supplement.

The evidence in the nature of an opinion that RM and/or MM might suffer psychological harm if returned to Canada was unconvincing because it did not appear to be based on an in-depth investigation, but rather on some office interviews and a review of hospital records that themselves did not disclose any grave medical or emotional issue. The evidence fell well short of supporting a finding of a *grave* risk of psychological harm.

## II. Rulings of Law

### A. Legal Framework

The Convention was adopted as a response to "the problem of international child abductions during domestic disputes." Abbott v. Abbott, 560 U.S. 1, 8 (2010). Its aim is "to

protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence," Convention, T.I.A.S. No. 11,670, at 7, and also to "restore the pre-removal status quo and discourage a parent from crossing international borders in search of a more sympathetic forum." Whallon v. Lynn, 230 F.3d 450, 455 (1st Cir. 2000). "The idea is that a child's best interests are better served when decisions about custody rights are made in the country of habitual residence. . . . . Thus, ordering the return of a child 'does not alter the existing allocation of custody rights.'" Darin v. Olivero-Huffman, 2014 WL 1053775, at *4 (1st Cir. 2014) (citing Abbott, 560 U.S. at 20).

A petitioner seeking the return of a child under the Hague Convention must establish by a preponderance of the evidence that the child was "wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1). Removal or retention is wrongful where –

> (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Kufner v. Kufner, 519 F.3d 33, 39 (1st Cir. 2008) (quoting Convention, art. 3, T.I.A.S. No. 11,670, at 9). If the petitioner demonstrates wrongful removal or retention, then the child must be promptly returned to his or her state of habitual residence, unless the respondent demonstrates that "one of the narrow exceptions set forth in the Convention applies." 42 U.S.C. § 11601(a)(4); see also Walsh v. Walsh, 221 F.3d 204, 217 (1st Cir. 2000).

B.  Wrongful Removal and Retention

To establish that the children were wrongfully removed and retained, Mauvais must prove that at the time of removal or retention, Canada – a signatory State to the Convention –

5

was the children's place of habitual residence and that Mauvais had been exercising his custody rights. Herisse does not dispute that Mauvais had custody rights over the children and had been exercising those rights immediately before the removal of MM and the retention of RM. She asserts, however, that the children were not habitually resident in Canada prior to their removal or retention.

The term "habitual residence" is not defined in the Convention or in ICARA. The First Circuit has adopted the Third Circuit's definition of a child's habitual residence as "the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." Darin, 2014 WL 1053775, at *7 (quoting Feder v. Evans-Feder, 63 F.3d 217, 224 (3d Cir. 1995)). The analysis:

> must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding the child's presence. The required degree of settled purpose does not necessarily entail an intention to stay in the place indefinitely; it may be for a limited period. It could encompass one or multiple goals, and be either general or specific. For example, a settled purpose with respect to residence could be education, business or profession, employment, health, family or merely love of the place.

Id. (internal citations and quotation marks omitted).

When the children are young and thus lack the ability to abandon a prior habitual residence, courts look to the shared intention or settled purpose of the parents regarding the children's residence. Id. Herisse contends that she and Mauvais never had a shared intent or settled purpose to make Canada the children's habitual residence. She testified at trial that after giving birth to RM in Massachusetts, she had wanted Mauvais and MM to join her in the United States, but he would not.

It thus appears that the parties lacked a shared intent as of March 2010. Nevertheless, after that and prior to the children's removal and retention in September 2013, it appears from

their actions that the parties both were content to have their children live in their existing setting in Canada. For approximately two years, the children lived in a settled, "acclimatized" way in Canada. The fact that one or both of the parties may have harbored some desire eventually to move to the United States does not undercut these conclusions. See Gitter v. Gitter, 396 F.3d 124, 134 (2d Cir. 2005). After Herisse had stopped living with Mauvais, she established her own household with the children in Montreal. The children attended school and participated in various social activities. Herisse's actions show that even when she was not under Mauvais's control or influence, she chose to remain in Canada. That she subsequently had a change of heart and decided that the children would be better off living elsewhere is of no moment, as any such intent was not a shared one with Mauvais. It is noteworthy RM has spent almost her entire life, and MM about half her life, in Canada, and the evidence presented at trial shows that both she and MM have had sufficient time for acclimatization.

In sum, I conclude that Mauvais has proven that Canada was the habitual residence of the children at the time of their retention and removal and, consequently, that MM and RM were wrongfully removed or retained within the meaning of the Convention.

### C. Grave Risk of Harm

Wrongful removal or retention requires the return of the child to his or her place of habitual residence, unless one of four exceptions applies. See Walsh v. Walsh, 221 F.3d 204, 216 (1st Cir. 2000). Herisse relies on the exception articulated in Article 13(b) of the Convention:

> Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

Id. at 217 (quoting Convention, art. 13(b), T.I.A.S. No. 11,670, at 8). The party opposing return must establish this exception by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A).

Herisse contends that MM and RM face a grave risk of physical and psychological harm if they return to Canada. At trial, Herisse testified that Mauvais has sexually abused her for many years, that BM has acted in sexually inappropriate ways toward MM on numerous occasions, and that Mauvais has been violent toward BM. Herisse also argued that RM's medical issues might not be as adequately addressed in Canada as in the United States.

Herisse relies heavily on the First Circuit's decision in Walsh, but in that case the court relied on "ample evidence" that the petitioner "has been and can be extremely violent and . . . cannot control his temper," and that the petitioner had a history of violence toward others, including threats to kill a neighbor and a physical confrontation with his adult son. Walsh, 221 F.3d at 219-20. The petitioner in Walsh was also a fugitive who had demonstrated a "chronic disobedience of court orders." Id. at 219. These factors, among others, convinced the Walsh court that there existed a grave risk of physical or psychological harm and that no undertakings could render the risks less than grave. Id. at 220. The court also noted that the district court was in error when it distinguished the petitioner's acts of violence that were directed at people other than the children because he had "demonstrated an uncontrollably violent temper," "his assaults ha[d] been bloody and severe," and they were at times directed toward "persons much younger than he." Id. Further, "credible social science literature establishes that serial spousal abusers are also likely to be child abusers."

The facts of this case are neither as dire nor as clear. Herisse admits that Mauvais has never harmed or attempted to harm MM or RM. It is telling that even after moving out in January 2011, Herisse took no steps to prevent Mauvais from having contact with their children,

8

unlike the respondent in Walsh, who had sought numerous protective orders out of fear of harm to her or her children. A general likelihood that serial spousal abusers may also eventually abuse their children is insufficient to establish, by the requisite degree of proof, grave risk of physical or psychological harm to MM and RM. Further, as to RM's medical care, there is insufficient evidence that there is a grave risk that RM's medical condition cannot be appropriately addressed in Canadian medical facilities.

### III.  Conclusion

For the foregoing reasons, Mauvais's petition (dkt. no. 1) for the return of MM and RM to Canada pursuant to the Convention is GRANTED. The Court further ORDERS Herisse promptly and no later than June 1, 2014, to arrange to return MM and RM to Canada. In addition, Herisse is ORDERED to notify this Court in writing by May 15, 2014, as to what arrangements have been made to comply with this Order.

This Order shall be transmitted by the Clerk of the Court to the United States Department of State for transmittal to the Central Authority for Quebec.

This Order may be presented to any law enforcement agency of any Hague Convention signatory country by a party to secure any appropriate relief.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge