UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                          )
                                )
MANEL MAUVAIS,                  )
                                )
        Petitioner,             )
                                )   Civil Action
v.                              )   No. 13-13032-GAO
                                )
NATHALIE HERISSE,               )
                                )
        Respondent.             )
                                )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


MOTION HEARING


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, January 28, 2014
10:06 a.m.


Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

APPEARANCES:

    LAW OFFICE OF MATTHEW BARACH
    By: Matthew P. Barach, Esq.
        Jennifer Salerno, Esq.
    160 Speen Street
    Suite 307
    Framingham, Massachusetts  01701
    On Behalf of the Petitioner

    HARVARD LEGAL AID BUREAU
    By: James V. Moore, Supervising Attorney
        Nicholas Pastan and Breana Ware,
        SJC Rule 3:03 Counsel
    One Main Street
    Cambridge, Massachusetts  02142
    On Behalf of the Respondent


Also Present:  Nekita Lamour, Certified Interpreter

I N D E X

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **WITNESSES FOR THE PETITIONER:** | | | | |
| VINIA MAUVAIS | | | | |
| By Mr. Barach | 9 | | | |
| BEVERLY BERNARD | | | | |
| By Mr. Barach | 105 | | | |
| **WITNESSES FOR THE RESPONDENT:** | | | | |
| NATHALIE HERISSE | | | | |
| By Mr. Pastan | 25 | | 63 | |
| By Mr. Barach | | 51 | | |
| ELI HERBERT NEWBERGER | | | | |
| By Mr. Pastan | 69 | | | |
| By Mr. Barach | | 82 | | |
| ANN CHRISTINA HERISSE | | | | |
| By Ms. Ware | 96 | | | |
| By Mr. Barach | | 101 | | |

P R O C E E D I N G S

1

2          THE CLERK:  All rise.

3          (The Court enters the courtroom at 10:06 a.m.)

4          THE CLERK:  The United States District Court for the

5     District of Massachusetts.  Court is in session.  Be seated.

6          For a motion hearing in the case of Manel Mauvais

7     versus Nathalie Herisse, 13-13032.  Will counsel identify

8     yourselves for the record.

9          MR. BARACH:  Good morning, your Honor.  Matthew Barach

10    for Manel Mauvais.

11         MS. SALERNO:  Good morning, your Honor.  Attorney

12    Jennifer Salerno with Matthew Barach.

13         MR. PASTAN:  Good morning, your Honor.  Nicholas

14    Pastan, 3:03 counsel for the defendant.

15         MR. MOORE:  Verner Moore, supervising attorney,

16    Harvard Legal Aid Bureau.

17         MS. WARE:  Good morning, your Honor.  Breana Ware also

18    3:03 counsel for the respondent.

19         THE COURT:  All right.  Good morning.  You may all be

20    seated.

21         I've been handed a couple of motions that I guess the

22    petitioner is filing this morning, and they seem to -- well, I

23    gather you've seen them.

24         MR. PASTAN:  Yes, your Honor.

25         THE COURT:  Let's address those.  Before we do that,

1  let me -- why don't you give me -- I don't need an opening

2  statement.  I mean, I've read the papers.  Why don't you give

3  me an overview as to what you anticipate the evidence will

4  be --

5          MR. BARACH:  Certainly, your Honor.

6          THE COURT:  -- that is, the order of witnesses and

7  that sort of thing.  I don't mean a summary of the evidence.  I

8  mean, who are you going to call and so on.

9          MR. BARACH:  Judge, we have one witness besides the

10 witness of the petitioner, Mr. Mauvais, whose testimony we're

11 going to ask to come in as an unavailable witness under Rule

12 32(a).  That will be Mrs. Mauvais, who is the sister of

13 Mr. Mauvais.  That's our only other witness.

14         THE COURT:  Okay.  How long -- well, never mind.  Let

15 me hear who the witnesses for the respondent will be.

16         MR. PASTAN:  Your Honor, the respondent will be

17 calling three witness.  She herself will testify; her aunt,

18 Christina Herisse, will testify; and well as Dr. Eli Newberger.

19         THE COURT:  Okay.  How many of the witnesses are not

20 fluent in English, or are not expected to testify in English?

21         MR. BARACH:  Our witness will be testifying in

22 English, your Honor.

23         MR. PASTAN:  Two of our witnesses, the respondent and

24 her aunt, will be testifying through an interpreter, your

25 Honor.

1          THE COURT:  Okay.  So now let's address the issues

2     raised by the two motions that have just been filed.  Let's

3     take first the admission of the deposition.  Is there an

4     objection to that?

5          MR. PASTAN:  Your Honor, for showing of unavailability

6     there won't be an objection.  We'd just ask that a showing be

7     made.

8          MR. BARACH:  Judge, I think we've demonstrated that

9     his visa was denied.  He wasn't allowed entry into the United

10    States to be present at this hearing.  So I believe that makes

11    him an unavailable witness within the meaning of the rule.

12         THE COURT:  Yeah, it seems to.

13         MR. PASTAN:  Then we have no objection.

14         THE COURT:  Okay.  And how do you propose to -- he's

15    going to submit the deposition?

16         MR. BARACH:  What we've done, your Honor, is we've

17    submitted about a dozen exhibits.  Now that there's no

18    objection, within the exhibit book is the deposition of our

19    client, who Mr. Nicholas Pastan had an opportunity to

20    cross-examine.  So we'll just submit it and have you read it.

21    I don't think it needs to be read in, unless that's your

22    practice to do that, but I think you can read it.

23         THE COURT:  No, not --

24         MR. PASTAN:  The respondent would request that the

25    restatements be read in from the deposition before her

1 testimony takes place.

2       THE COURT:  Well, it would in the normal course, I

3 guess, because -- well, I mean, we don't have to read it into

4 this record.  I can just read it.

5       MR. PASTAN:  Yes, I understand, your Honor.

6       THE COURT:  So if you want, I'll read the deposition

7 as part of the plaintiff's presentation -- petitioner's

8 presentation of his case, and that will be before you have any

9 of your witnesses called.  So I think that will satisfy your

10 issue, right?

11       MR. PASTAN:  We'd like to read, yes, three of the

12 cross-examination statements before we present our witness

13 testimony, if that's possible.

14       THE COURT:  Right.  And what I'm saying is after

15 Mr. Barach has a live witness, we'll hear from that witness,

16 I'll read the deposition.  And so whatever you wanted to get in

17 would be in, and then you can present your case.

18       MR. PASTAN:  Thank you, your Honor.

19       THE COURT:  Okay.  The other motion we may not have to

20 get to for a while relates to the testimony of Dr. Newberger.

21       MR. BARACH:  My only issue for now, your Honor, would

22 be that I would ask that the witnesses be sequestered.

23       THE COURT:  I think that's a very good idea.

24       MR. MOORE:  Your Honor, we would ask that the

25 respondent be allowed to stay.

1          THE COURT:  The respondent may stay.  She's a party.
2     She may stay.
3          MR. PASTAN:  We would also request that Dr. Eli
4     Newberger be allowed to stay as it would help inform his
5     testimony later in the proceedings, to hear whatever other
6     testimony would first take place.
7          THE COURT:  Well, no, I think we'll limit the -- well,
8     it's not limiting the exception.  The parties are always
9     entitled to stay.  But I think we'll follow the rule which is
10    presumptive that testifying witnesses will be excluded during
11    the testimony of other witnesses.
12         MR. PASTAN:  Thank you, your Honor.
13         THE COURT:  So, Dr. Newberger?  Thank you.  And
14    whoever else.  I guess Ann Christina Herisse.
15         (The witnesses exit the courtroom.)
16         THE COURT:  All right?  Is that all the preliminaries?
17    Then we can --
18         MR. BARACH:  That's all I have, your Honor.
19         THE COURT:  Okay.  Then do you want to call your first
20    witness?
21         MR. BARACH:  Would you like an opening statement or do
22    you want to keep it moving?  I don't think it's necessary.
23         THE COURT:  As I said, I've read the papers.  I'm
24    pretty familiar with what the parties are saying.
25         MR. BARACH:  I'll need my first witness, Mrs. Mauvais.

1    VINIA MAUVAIS, duly sworn

2         THE CLERK:  Have a seat.  State your name, spell your

3    last name slowly for the record, and keep your voice up and

4    speak into the mic so the judge can hear you.

5         THE WITNESS:  Vinia Mauvais.

6         THE CLERK:  First name?

7         THE WITNESS:  Vinia.

8         THE CLERK:  Spell it.

9         THE WITNESS:  V-I-N-I-A, Mauvais, M-A-U-V-A-I-S.

10         THE CLERK:  Great.  Thank you.

11                    DIRECT EXAMINATION

12    BY MR. BARACH:

13    Q.   Miss Mauvais, could you state your current address.

14    A.   1837 La Vallée Street, La Vallée, Quebec, Canada.

15    Q.   And how long have you lived in Canada?

16    A.   Twenty years.

17    Q.   And when did you first -- why did you come to Canada?

18    A.   Oh, to live in Haiti, to go to Canada to get a better

19    life.

20    Q.   Are you currently employed?

21    A.   Yes.

22    Q.   And what is your occupation?

23    A.   Nurse's aide.

24    Q.   Did you know Manel Mauvais?

25    A.   Yes.

1     Q.    How do you know him?

2     A.    My brother.

3     Q.    And do you know Nathalie Herisse?

4     A.    Yes.

5     Q.    And how do you know her?

6     A.    She was my sister-in-law.

7     Q.    And do you know Manel and Nathalie's two children?

8     A.    Yes.

9     Q.    And moving this along, at some point did you come to live

10 with Manel, Nathalie and their two children?

11    A.    Yes.

12    Q.    And when was that?

13    A.    From February 2010 Manel came with Mayenah, then after

14 Nathalie came March 2010.

15    Q.    And did they come and live with you and your family?

16    A.    Yes.

17    Q.    Who else was living in the house?

18    A.    My husband and my two children and Manel's twins.

19    Q.    And did your children have a relationship with Manel's --

20    A.    Yes.

21    Q.    -- and Nathalie's children?

22    A.    Yes.

23    Q.    How was their relationship?

24    A.    Very good.

25    Q.    Did your husband have a relationship with Nathalie and

1 Manel's two children?

2 A.  Yes.

3 Q.  And how was their relationship?

4 A.  Very good.

5 Q.  And how long did Nathalie and Manel and the two children

6 live with you?

7 A.  About five months.

8 Q.  When did they move out?

9 A.  July 12, 2010.

10 Q.  Where did they move to?

11 A.  To their own apartment.

12 Q.  And who else was living with Manel, Nathalie, and the two

13 children in their own apartment?

14 A.  Manel's twins.

15 Q.  And do you recall how long they lived in that apartment

16 together?

17 A.  Until, I think, January or February 2011.

18 Q.  And without saying the address, the exact street address,

19 where was that apartment?

20 A.  It was at La Vallée in Canada, in Quebec.

21 Q.  How far was it from where you were living, when they were

22 living with you, to your home?

23 A.  About five minutes.

24 Q.  And while they lived in that apartment together, did you

25 see Manel and Nathalie's two children?

1  A.    Yes.

2  Q.    And how often did you see the two children?

3  A.    Every weekend.  Then during the week I always pass by

4  them.

5  Q.    What types of observations could you make about the

6  relationship between Manel and his two children during that

7  time?

8  A.    Very good.

9  Q.    What types of things did you observe with Manel and the

10  two children?

11  A.    For me, they have a good life together.  I didn't see

12  anything wrong with them.

13  Q.    During this time period did the children have activities

14  with Manel and Nathalie?

15  A.    Yes.

16  Q.    Are you aware of what type of activities they would do?

17  A.    Yes.  But they going out together, like they can go to the

18  park with their kids.

19  Q.    And at some point did Nathalie move out of the apartment

20  with Manel and the two children?

21  A.    Nathalie moved after, and Manel lived in the apartment.

22  Q.    And when Nathalie -- where did Nathalie move to with the

23  two children?

24  A.    By her stepmother and her two half brothers.

25  Q.    And just to be clear, did the two children, Nathalie and

1   Manel's two children, move with Nathalie?

2   A.   You mean RM and MM?

3   Q.   Yes.

4   A.   Yes.

5   Q.   If we can just refer to "Rhone" as "RM" and then "Mayenah"

6   as "MM"?

7   A.   Yes.

8   Q.   Where did Manel go after Nathalie and the two children

9   moved out?

10  A.   He stayed in the apartment.

11  Q.   And to your knowledge, after January/February of 2011 when

12  Nathalie moved out with the two children, did she stay in the

13  same residence until September of 2013?

14  A.   No.

15  Q.   Did she move to a second residence?

16  A.   Yes.

17  Q.   And where did she move -- where was the first residence

18  she moved to?

19  A.   After she stayed by her brothers and the stepmother, and

20  she moved, I think it was September, to her own apartment.

21  Q.   And did she stay in that apartment September -- until

22  2013, September, when she moved to Boston?

23  A.   She was living upstairs at the same address, then after

24  she moved into the basement at the same building until

25  September 13, 2012 -- 2013.  Sorry.

1    Q.    And where was this?

2    A.    I don't remember exactly the address.  I thought it was

3    155, but it's Antonio --

4    Q.    I don't need the actual -- where was the city?

5    A.    Okay.  The city was in Montreal.

6    Q.    And after Manel and Nathalie stopped living together, did

7    Manel continue to see RM and MM, the two children?

8    A.    Yes.

9    Q.    And how often did Manel see the children?

10   A.    Every weekend by me.

11   Q.    And did he have overnights with the two children, with RM

12   and MM?

13   A.    Yes.

14   Q.    And how often did Manel have these overnights?

15   A.    The weekends when he stayed by me.

16   Q.    And to your knowledge would he see them during the week?

17   A.    At the beginning, no.

18   Q.    At some point in 2013 did he see --

19   A.    Yes.

20   Q.    -- RM and MM during the week?

21   A.    To my knowledge, yes.

22   Q.    Are you aware of any financial contributions Manel made

23   for the support of RM and MM through Nathalie?

24   A.    Yes.

25   Q.    And what are those, to your knowledge?

1  A.   What I know, Manel support Nathalie to help her with the

2  children, and he helped her to pay the apartment and take care

3  of the children.

4  Q.   And turning your attention to more recent times in 2013,

5  did Manel see RM and MM during 2013 from, say, January to

6  September when Nathalie took the children to Boston?

7  A.   From January 2013 --

8  Q.   On or about January 2013 to September 2013.

9  A.   Yes.

10  Q.   And how often during that time frame did Manel see the

11  children?

12  A.   I knew he go during the weekend, he pass by Nathalie, but

13  every weekend he saw them by me in my house.  Because the kids,

14  I always pick them up on the weekends.

15  Q.   And in 2013, how did the children react when their father

16  spent time with them, based on your observations?

17  A.   Whenever they see their father, "Papa."  They scream.

18  Especially MM.

19  Q.   And what kind of activities did Manel do with the children

20  during this time frame?

21  A.   With Manel -- he loved to pass time with the children.  He

22  watching movies with them, he played games with them, read the

23  books with them.

24  Q.   How would you describe to the Court what type of father

25  Manel is to the two children?

1  A.    To me Manel is very good father, have good relationship

2  with the children.

3  Q.    And what is your relationship with RM and MM?

4  A.    I'm their aunt.  But as Nathalie always say, I'm their

5  grandmother, because they are very close to me.  It look like

6  I'm their grandmother.

7  Q.    Do you take care of the children for Nathalie sometimes?

8  A.    Yes.

9  Q.    And did that occur in 2013?

10  A.    Yes.

11  Q.    Does your daughter have a relationship with RM and MM?

12  A.    Very good.  My two daughters.

13  Q.    And do they do activities with RM and MM?

14  A.    Yes.  Yes.

15  Q.    And what type of activities do your children do with RM

16  and MM?

17  A.    They love to go out with the children, and the children

18  always happy.  Bring them to the movies and go to the park,

19  make children activities for them.

20  Q.    You stated -- is it true that Manel has other children not

21  with Nathalie?

22  A.    Yes.

23  Q.    And does he have two twins?

24  A.    Yes.

25  Q.    And how was the relationship between the two twins and RM

1　and MM?

2　A.　Very good.　They playing together.　They have very good

3　relationship.

4　Q.　To your knowledge, were RM and MM ever left with the twins

5　unsupervised?

6　A.　No.

7　Q.　During the time they were with you on the weekends, was RM

8　and MM and the twins ever left unsupervised?

9　A.　No.

10　Q.　Do the children attend school in Canada?

11　A.　Yes.

12　Q.　What grade is MM enrolled in?

13　A.　MM is Grade 2.

14　Q.　And how long has she been, to your knowledge, attending

15　the school that MM is in Grade 2?

16　A.　Can you repeat?

17　Q.　Do you know how long MM has been enrolled in her school in

18　Canada?

19　A.　Two years.

20　Q.　Thank you.

21　A.　Before she was in the kindergarten.

22　Q.　And how does MM do academically?

23　A.　Very good.

24　Q.　To your knowledge, are there any problems with MM's

25　school?

```
 1   A.    No.

 2   Q.    Does MM have friends at school?

 3   A.    Yes.

 4         MR. PASTAN:  Objection.  Lack of foundation, your

 5   Honor.

 6         THE COURT:  Overruled.

 7   BY MR. BARACH:

 8   Q.    How do you know she has friends?

 9   A.    She always tell me.  She always talk about her friends.

10   Q.    To your knowledge, is MM involved in activities?

11   A.    Yes.

12   Q.    And what type of activities is MM involved in?

13   A.    Before she was on the -- like play basketball at school,

14   and ice-skate.  And she's like -- she like to do modeling.

15   Q.    In 2013, to your knowledge, was she involved in a

16   modeling-type program?

17   A.    She was supposed to start in October.  And they already

18   paid everything for her to start.

19   Q.    What grade is RM in?

20   A.    She's in the kindergarten.

21   Q.    And did RM enjoy school, to your knowledge?

22   A.    Yes.

23   Q.    Were there any problems with RM in school, to the best of

24   your knowledge?

25   A.    No.  No.
```

```
1    Q.    Does RM have friends at school?

2    A.    Yes.

3    Q.    Has RM ever had friends over to her home?

4    A.    Yes.

5    Q.    Has RM ever gone to her friend's home for play dates?

6    A.    Yes.

7    Q.    To your knowledge, is RM involved in any activities?

8    A.    No.

9    Q.    What types of things does RM like to do?

10   A.    She like to play with the kids like her.  That's why my

11   kids always go and do activities, the kids' program with them.

12   Q.    I want to ask you something.  What language does RM and RM

13   speak?

14   A.    French.

15   Q.    And what type of French accent does RM and RM have?

16   A.    French Canadian.

17   Q.    Is this different, this accent, than native Haitians who

18   speak French in Canada?

19   A.    Yes.

20   Q.    How is it different?

21   A.    It's Québecois, French.

22         THE COURT:  I'm sorry.  I didn't hear the answer.

23   Q.    Can you repeat that?

24   A.    Québecois accent is different than French -- Haitian

25   accent.
```

1    Q.    Is it your testimony that the two children speak with a

2    Québecois, which is a Canadian accent version of French?

3    A.    Yeah.

4    Q.    Do the children attend church in Canada?

5    A.    Yes.

6    Q.    And where?

7    A.    In La Vallée, Quebec.

8    Q.    And who do the children -- RM and MM attend church with?

9    A.    With me and my family.

10    Q.    And how often is that?

11    A.    Every Sunday.

12    Q.    And was that every Sunday in 2013?

13    A.    No, since they came to Canada.

14    Q.    Is that -- did they attend church since 2010,

15    approximately?

16    A.    Yes.

17    Q.    And what religion do you practice -- do the children

18    practice?

19    A.    They go with me to the Protestant church.

20    Q.    Do the children attend Sunday school?

21    A.    Yes.

22    Q.    And when is this?

23    A.    Every Sunday.

24    Q.    Do the children have friends from Sunday school?

25    A.    Yes.

1   Q.   Do the children do activities at the Sunday school?

2   A.   Yes.

3   Q.   And what type of religious activities do they do?

4   A.   They learning the Bible, learning their coloring from the

5   Bible.  And they love the activities.

6   Q.   Does RM and MM enjoy going to church every Sunday?

7   A.   Yes.

8   Q.   What other relatives do the children have in Canada?

9   A.   My sister with her husband and her two children.

10  Q.   And what type of relationship does your sister and her

11  husband have with the children RM and MM?

12  A.   Very good relationship.

13  Q.   And how often do they see them?

14  A.   Every weekend.

15  Q.   Any other relatives on your side of the family that RM and

16  MM see regularly?

17  A.   No.

18  Q.   And do any relatives on Nathalie's side live in Canada?

19  A.   Yes.

20  Q.   And who are they?

21  A.   Her two brothers.

22  Q.   And to your knowledge, does RM and MM have a relationship

23  with her two brothers?

24  A.   Yes.

25  Q.   And to your knowledge, how often do they see each other?

1    A.    I don't know.

2    Q.    Was Manel and Nathalie married, to your knowledge?

3    A.    Yes.

4    Q.    At some point is it your understanding -- to your

5    knowledge, did the relationship break down between Nathalie and

6    Manel?

7    A.    Can you repeat, please?

8    Q.    To your knowledge, is it true that at some point Manel and

9    Nathalie's relationship broke down?

10   A.    Well, at the beginning, yes, I know, they have a good

11   relationship.

12   Q.    And at some point did the romantic relationship end

13   between Nathalie and Manel, to your knowledge?

14   A.    I don't understand clearly.

15   Q.    Okay.  I know English isn't your first language.  I'll try

16   to go slow.  In 2011 did the relationship, in January or

17   February, between Manel and Nathalie end?

18   A.    Yes.

19   Q.    Okay.  And does Manel have a new wife?

20   A.    Yes.

21   Q.    And who is that?

22   A.    Her name is Sandra.

23   Q.    Her name is Sandra?  And when did Manel marry Sandra?

24   A.    It was last summer.  I don't remember exactly the date.

25   Q.    And does Sandra live with Manel and his other two

1  children?

2  A.    Yes.

3  Q.    I want to ask you, did the children have health

4  insurance -- health benefits in Canada?

5  A.    They have healthcare.

6          MR. PASTAN:  Objection.

7          THE COURT:  Overruled.

8  BY MR. BARACH:

9  Q.    Could you repeat your answer?

10  A.    Yeah, they have the healthcare, so from the federal

11  government.

12          MR. BARACH:  I have nothing further.

13          THE COURT:  I just have one question before you go

14  ahead.  How old are your children?

15          THE WITNESS:  22 and 16.

16          THE COURT:  All right.  Mr. Pastan?

17          MR. PASTAN:  We have no questions, your Honor.

18          THE COURT:  No questions?  All right, Ms. Mauvais.

19  You may step down.  Thank you.

20          THE WITNESS:  Thank you.

21          (The witness is excused.)

22          THE COURT:  I think we'll take a break so I could now

23  read the deposition, if we have it someplace.

24          MR. BARACH:  Your Honor, it's in the exhibit book.

25          MS. SALERNO:  It's at the very end of the blue book.

1          THE COURT:  I'll find it.  All right.  I guess I have

2     it.  All right.  We'll take a break and I'll read the

3     deposition.

4          THE CLERK:  All rise for the Court.  The Court will

5     take a short recess.

6          (The Court exits the courtroom and there is a recess

7     in the proceedings at 10:32 a.m.)

8          THE CLERK:  All rise for the Court.

9          (The Court enters the courtroom at 11:09 a.m.)

10          THE CLERK:  For a continuation of the motion hearing.

11     Be seated.

12          THE COURT:  Okay.  I've now read the deposition and

13     looked at some of the exhibits.

14          Mr. Pastan?

15          MR. PASTAN:  Your Honor, the defense calls Nathalie

16     Herisse.

17          THE COURT:  And she'll be testifying through an

18     interpreter?

19          MR. PASTAN:  Yes, she will, your Honor.

20                    NEKITA LAMOUR, duly sworn

21          THE CLERK:  Please state your name, and spell your

22     last name for the record.

23          THE INTERPRETER:  Nekita Lamour, L-A-M-O-U-R.

24          THE CLERK:  Please stand.

25        NATHALIE HERISSE, duly sworn through the interpreter

1       THE CLERK:  State your name and spell your last name

2  for the record.

3       THE WITNESS:  Nathalie Herisse.

4       THE COURT:  You may be seated.

5                    DIRECT EXAMINATION

6  BY MR. PASTAN:

7  Q.   Ms. Herisse, are you a citizen of any country?

8  A.   No, only Haiti.

9  Q.   How do you know Mr. Mauvais?

10 A.   I met him at work.

11 Q.   Beyond meeting him at work, did you have any other kind of

12 relationship with Mr. Mauvais?

13 A.   Yes, we became friends.  Close friends.

14 Q.   Did your relationship ever progress beyond simply close

15 friends?

16 A.   Yes, we started going out together.

17 Q.   Around when did you start going out together?  What year?

18 A.   2002.

19 Q.   Do you and Mr. Mauvais have any children together?

20 A.   We have two children, girls.

21 Q.   Would you please give their initials?

22 A.   MM -- MSM, ML -- no, RJAM -- RJAM -- RGAM.

23 Q.   What is the gender of your children?

24 A.   Girl.

25 Q.   Starting with MM, when was she born?  Just the month and

1    the year.

2    A.    In France, December 15, 2005.

3    Q.    And RM, just giving the month and the year, when was she

4    born?

5    A.    November 2009.

6    Q.    How old are your children now?

7    A.    MM is eight; RM, four.  Four years old.

8    Q.    Did you and Mr. Mauvais ever live together in Haiti?

9    A.    Yes.

10   Q.    When did you live together in Haiti?

11   A.    From 2007 to 2009.

12   Q.    When you were living together in Haiti, was there anybody

13   else living with you?

14   A.    At the beginning I had my mother, and then after my sister

15   and his -- okay.  My sister and her children.

16   Q.    And were there ever any other children living with you in

17   Haiti?

18   A.    From 2005 there were Belucci and Sathie -- 2008.

19   Q.    How old are these two children?

20   A.    When they first came?

21   Q.    No.  How old are they now?  Excuse me.

22   A.    They are nine now.

23   Q.    Are these children twins?

24   A.    Yes, they are twins.

25   Q.    To your knowledge, who's the mother of these twins?

1          THE INTERPRETER:  Say it again?

2          MR. PASTAN:  To your knowledge, who is the mother of

3     these twins?

4          THE WITNESS:  Another woman that Mauvais had.

5     BY MR. PASTAN:

6     Q.   When you were living together with the twins, Manel and

7     some of your other family as well as MM, did you ever notice

8     any interactions between MM and the twins?

9     A.   Yes.

10    Q.   What kinds of interactions did you notice?

11    A.   One day I was in my room.  My sister was going by the

12    living room.  She called me -- she was insistently calling me.

13    She said, "Come.  Run to see what is happening."  And when I

14    went to see, to look, I found the girl holding Mayenah's foot,

15    and the boy's pants were down.  And he was trying to penetrate

16    Mayenah.  And he was encouraging the other one to come on.

17    Q.   When you said the girl and the boy, could you just clarify

18    who you're talking about, please?

19    A.   The twins.

20    Q.   How many times did you see behavior like this?

21    A.   I saw that in Haiti and Canada.

22    Q.   Did you notice anything else about the twins being around

23    your daughter MM?

24    A.   Sometimes they don't want to play with her.  They say,

25    "You are not my sister.  You are not our sister.  We have

1  another sister," who's the same mother who lives in St. Maarten
2  with her mother.
3  Q.   Before we talk about that, I want to just go back for just
4  one second.  You said that you saw the boy twin on top of MM.
5  What happened after that?
6  A.   When I saw that, I ran and called the father.  And I said,
7  "Come and see what is happening."  When he saw that, he got
8  very upset.  He took both twins and he went into the room with
9  them and started hitting -- he started to hit Sathie.  And then
10 after he hit Sathie, he beat Belucci with rage.  He hit him so
11 hard that I finally came and intervened.
12 Q.   You say that he hit SM and then BM.  What did he hit them
13 with?
14 A.   With a belt.
15 Q.   Where did he hit them with this belt?
16 A.   Everywhere, because the kids were moving.  They didn't
17 want to be hit.
18 Q.   And did you see that paddling?
19 A.   Yes; I was in the room.
20 Q.   Was anybody else in the room?
21 A.   No, there were four of us:  Manel, me, and the two twins.
22 Q.   What did you think about that form of punishment?
23 A.   I said, "You have to talk with the children.  Hitting them
24 is not going to prevent them from doing what they were doing,
25 so you have to speak with them."

1    Q.   Were there any other events similar to this one that took

2    place in Haiti?

3    A.   Yes.

4    Q.   Can you please describe them?

5    A.   When I came in 2009 to have the baby, to give birth, I had

6    my younger sister watch Mayenah because I didn't trust the

7    father to watch Mayenah.  Then she called me and told me the

8    same thing that Belucci tried to do --

9         MR. BARACH:  Objection.  Nonresponsive.

10        THE COURT:  Sustained.  Sustained.

11        MR. BARACH:  Move to strike.

12        THE COURT:  Yes, it will be stricken.  Wait for the

13   next question.

14   BY MR. PASTAN:

15   Q.   After this incident where you saw BM and SM on top of

16   Mayenah and Manel hit them, what did you think about his

17   ability to care for the children?

18        MR. BARACH:  Objection.  Leading.

19        THE COURT:  I'll permit it.

20        THE WITNESS:  I became to be afraid.  I didn't feel

21   safe.  Every time he was in the place of Manel, I didn't feel

22   safe.  I was looking to see what he was doing, so I didn't feel

23   safe.

24   BY MR. PASTAN:

25   Q.   When he hit them, what did he hit them with?

A.    With a belt.

       MR. BARACH:  Objection.  Asked and answered.

       THE COURT:  It may stand.

BY MR. PASTAN:

Q.    Ms. Herisse, a while ago you started to describe other interactions between BM, SM and MM.  Could you explain what other things you saw between them?

A.    They used to hit Mayenah.  Sometimes they want to play with Mayenah, and they will say, "No, we don't want to play with you."

Q.    What would happen during these incidents?

A.    I tried to speak with them and say, like, "You are sisters.  You have to get together, you have to be together so don't do those kinds of things.  You have to play together." So I tried to speak with them.

Q.    And was Manel ever involved in these interactions with the kids?

A.    Yes, his reaction was once Belucci bite -- bit Mayenah, and my Mayenah was crying, Mayenah came and told us that Belucci bit her, and he asked Mayenah to show him on what finger she was bitten.

       MR. BARACH:  Objection.  Move to strike. Nonresponsive.

       THE COURT:  It may stand.  Go ahead.

       MR. PASTAN:  Can she continue to answer the question?

1  I didn't hear you, your Honor.

2          THE COURT:  Yes, she may continue.

3  BY MR. PASTAN:

4  Q.   You may continue.

5  A.   He asked Mayenah, "On what finger did Belucci bit you,"

6  and Mayenah showed the finger.  So he had Mayenah bit Belucci

7  also on the same finger.  And ever since, they don't beat each

8  other anymore.

9          THE INTERPRETER:  Bite.  I'm sorry.  Bite.

10  Q.   Ms. Herisse, you've told us a little bit about the

11  relationship with the children.  I want to talk about your

12  relationship with Manel at this time in Haiti.  What was it

13  like?

14  A.   At the beginning it was a normal relationship, then in

15  2007 when we started living together, things degenerate.

16  Q.   What do you mean by "degenerate"?

17  A.   He wants to get into sexual relationship with me.  Even

18  though I said no, he keeps pushing me, pulls me, and he wants

19  to have sex with me.

20  Q.   And what would happen during those times where he wanted

21  to have sex with you and you would say no?

22  A.   He forced me until he found what he wanted.

23  Q.   Around how often did he force you to have sex?

24  A.   If I have to count to ten, I would say eight times.

25  Q.   After he would force you to have sex, how would you feel

physically?

A.   Sometimes when I go to the bathroom to urinate, I feel some burning, and it feels like I've been torn apart.

Q.   You told us that RM was born in 2009.  What was your sexual relationship with Mr. Mauvais like when you were pregnant?

A.   It was the same thing.

Q.   Where was RM born?

A.   Boston Medical Center.

Q.   Why did you travel to the United States to give birth to RM?

A.   Because the healthcare system there is not that good, and under the circumstances not at a safe level.

Q.   When you were here in the United States in 2009, who were you living with?

A.   I was living with my aunt.

Q.   Where was MM during this time?

A.   He was in Haiti.

Q.   And who was taking care of her in Haiti?

A.   I left my younger sister in the house especially for that.

Q.   Why didn't you return to Haiti after giving birth?

A.   I was supposed to return to Haiti on January 10th, but there were some papers that the father had to sign so the child could have the father's last name.  So I had to wait for that.

Q.   Did those documents ever arrive?

1   A.   Finally they arrived, very late.  Those documents arrived

2   very late.  And the earthquake occurred and I couldn't return

3   to Haiti.

4   Q.   What did your family do immediately after this earthquake

5   that you said just occurred?

6   A.   The earthquake happened on January 12th.  For two days I

7   couldn't hear the news.  I didn't hear anything from Manel and

8   Mayenah to know how they were doing.

9        Okay.  So given that at that time they offered -- the

10  Americans were offered to come to the United States with their

11  families so they could help.  So when I heard the news I told

12  Manel to give Mayenah -- because I had three aunts in Haiti.

13  So Mayenah -- so they could come with the kids here.

14  Q.   And how did Manel respond when you asked him to give

15  Mayenah to your aunts to come to the United States?

16            MR. BARACH:  Objection.  Marital privilege.

17            THE COURT:  Overruled.

18  BY MR. PASTAN:

19  Q.   You may answer the question.  How did -- how did Manel

20  respond when you asked him to give Mayenah to an aunt to bring

21  to Haiti?

22  A.   At first he said no, and then he said he will arrange it

23  so that Mayenah will come here.  Finally, my aunt called.  They

24  waited, they waited, he never called them back.  Finally, they

25  came in without Mayenah.

1  Q.   You say they came in without Mayenah.  Who do you mean?

2  A.   My three aunts:  Ann Christina, Michelin and Mary Jo.

3  Q.   What ended up happening with MM?

4  A.   Finally, there were no houses for them to live in Haiti,

5  so they were living in the street.  So Manel went to the

6  Dominican Republic with the kids.

7  Q.   And did the kids stay in the Dominican Republic?

8  A.   Yes, for some time.

9  Q.   And after this time where did they go?

10  A.   While in the Dominican Republic, his sisters helped him do

11  some movements so they could come to -- get papers to come to

12  Canada.

13  Q.   How did you feel about them going to Canada?

14  A.   I was very worried since my sister was not there to watch

15  the kids, to take care of them.  So I was wondering if Belucci

16  was going to do the same thing with Mayenah.

17  Q.   Where were you when Manel took the kids to Canada?

18  A.   I was in Boston.

19  Q.   Did you intend to stay in Boston?

20  A.   Yes.

21  Q.   What, if any, steps did you take to gain status that would

22  let you stay there?

23  A.   After the earthquake the American public gave the Haitians

24  the opportunity to apply for -- to address the statutes under a

25  law called TPS.

Q.   Ms. Herisse, may I direct your attention to Exhibit J in
the black binder in front of you?

          THE INTERPRETER:  "J" as in "juice," right?

          MR. PASTAN:  Yeah.

BY MR. PASTAN:

Q.   Do you recognize Exhibit J?

A.   Yes.

Q.   What is it, Ms. Herisse?

A.   This is the government who wrote to me and say that given
I didn't continue the process, so they rejected my request.

Q.   Your request for?

A.   A request for TPS.

Q.   Why did you originally apply for TPS?

A.   So I could remain in the United States.

Q.   And why didn't you complete the process?

A.   I kept on asking Manel to have Mayenah come to me, to send
me Mayenah.  He didn't want to.  He was pressuring me, said,
"You are the one who's preventing me from getting my own papers
where I am."

Q.   Would you explain that?  What do you mean "you were
preventing me from getting my own papers"?

A.   He told me in Canada when the families' united, when
families are together, it's easier for them to get their
permanent residence.

Q.   At that point did you stay in the United States?

1   A.   Yes, I remained in the United States and I continued to

2   ask him to send Mayenah.

3   Q.   Did you ever leave the United States?

4   A.   Finally, yes, in March 2010.

5   Q.   Why did you leave the United States, Ms. Herisse?

6   A.   He told me if I -- "I know you cannot live without me, so

7   if you don't come, I'm going to find some rat poison.  I will

8   take some and I will give Mayenah the next."

9           MR. BARACH:  Objection.

10          THE COURT:  No, it may stand.

11          Go ahead.

12   BY MR. PASTAN:

13   Q.   What did you think when he said that he was going to

14   poison Mayenah?

15   A.   I was devastated.  I was heartbroken.  And it was -- he

16   insisted for me to come.  So I was worried if I didn't come, he

17   would have taken the poison and given some to Mayenah.

18   Q.   If Mr. Mauvais hadn't threatened MM, would you have ever

19   gone to Canada?

20   A.   I will continue -- I will insist -- I will insist that he

21   sends Mayenah to me because I know if I get the TPS, I will be

22   able to move.

23   Q.   Ms. Herisse, when did you leave for Canada?

24   A.   March 19th.

25   Q.   What happened when you got to the border in Canada?

1    A.   Before I left he told me he has a friend who works in

2    Canada and he can help me in the border when I got there.

3    Finally, when I get to the border, the immigration agent said,

4    "Seeing as you don't have a Canadian visa, you cannot enter."

5    Q.   Were you finally allowed to enter Canada?

6    A.   Finally, yes.  His friend said I could have purchased a

7    visa on the border but his friend did not do that.  Finally, I

8    asked for asylum, for refugee asylum, so I could enter.

9    Q.   Why did --

10    You said you asked for asylum.  Did you have to go through

11    any process to get asylum?

12    A.   On the border they give me a lot of papers.  Among them, a

13    paper that requested more information from me.  And I had a

14    meeting the next day at eight o'clock in the morning.

15    Q.   Did you attend that meeting?

16    A.   No.

17    Q.   Were you ever granted asylum in Canada?

18    A.   No.

19    Q.   Were you ever granted any legal status in Canada?

20    A.   No.

21    Q.   Were your children, MM or RM, ever granted any legal

22    status in Canada?

23    A.   No.

24    Q.   Where did you live upon entering Canada, Ms. Herisse?

25    A.   When I first go to Canada, I was living with Manel's

 1  sister.

 2  Q.    Okay.  Was anybody else in the house?

 3  A.    Her husband and two children, two daughters.

 4  Q.    And were you living with Mr. Mauvais at this time?

 5  A.    Yes, Mr. Mauvais and the four children.

 6  Q.    Who were the four children?

 7  A.    Mayenah, Rhone, Sathie and Belucci.

 8  Q.    Who was responsible for taking care of the children?

 9  A.    It was me.

10  Q.    What concerns, if any, did you have about living with the

11  other children?

12  A.    Belucci's my biggest problem.

13  Q.    When you first moved to Canada, did you notice either of

14  the twins interacting with your children in any way?

15  A.    Yes.

16  Q.    What did you observe?

17  A.    I saw Belucci down the stairs -- on the stairs with his

18  pants down, and he was like two inches to penetrate Mayenah.

19  Q.    Did Mr. Mauvais become aware of this incident at all?

20  A.    Yes, I told him.

21  Q.    How did he respond?

22  A.    He hit Belucci, and he hit him again.

23  Q.    What did he hit him with?

24  A.    With a belt.

25  Q.    Where did he hit him?

A.   Everywhere.  Everywhere.  Everywhere.

Q.   How long did you continue living in -- with Manel at his sister's house?

A.   Three and a half to four months, until the sister told us to "Find your own apartment, your own place."

MR. BARACH:  Objection.  Nonresponsive.

THE COURT:  Overruled.

BY MR. PASTAN:

Q.   Where did you go?

A.   I went to live with -- me and Manel and the four children in an apartment that we rented.

Q.   When you moved into this apartment how, if at all, did your relationship with Manel change?

A.   At that time I wasn't working, so Manel was really pushing me.  He was insisting that I had relation with him.  He said that "I'm the one working and you're not doing anything in the house, so this, you have to do it for me."

Q.   What exactly would he do to you?

A.   When he wants to have sexual relationship with me and I don't want to, I start crying.  He pushes me, throws me on the bed, and finally I give up.

Q.   How often would he force you to have sex with him?

A.   Very often.

Q.   Where were the kids when Manel would force you to have sex with him?

1  A.    They are in the house because -- they had their own room.

2  Q.    Were any of the children ever in the room with you when he

3  would force you to have sex with him?

4  A.    At that moment, no.

5  Q.    And at any point were the children present when he would

6  force you to have sex with him?

7         MR. BARACH:  Objection.  Asked and answered.

8         THE COURT:  The objection is overruled.

9  BY MR. PASTAN:

10 Q.    At any point were the children present when he would force

11 you to have sex with him?

12 A.    At a certain time, yes.

13 Q.    Can you describe when?

14 A.    Sometimes Rhone doesn't want to sleep in her own bed so

15 she was in the bed.  And then he told me to cover myself with a

16 sheet, and then we had sex when Rhone was in the bed.

17 Q.    About how far away was Rhone at the time that you had sex

18 with Manel?

19 A.    So Rhone was close to me, came close to me, because she

20 saw me moving, and she's saying, "What is dad doing to you?"

21 Q.    And about how close?

22 A.    Close.  Stuck with me.  Close with me.

23 Q.    About how often did this happen?

24 A.    Many times.  Often.

25 Q.    Did you notice any changes in any of your children at this

1  time?

2  A.  For instance, if he wants to do that during the daytime,

3  the children will come and knock at the door, the bedroom door.

4  Q.  Was there any change in their behavior?

5  A.  Okay.  Mayenah would become closer to me.  She will stay

6  close to me because she would say, "If I'm close to you, dad

7  won't start yelling at you."

8  Q.  I would like to talk to you -- move forward a little bit

9  and talk to you about January 11, 2011.  What happened on that

10  date?

11  A.  Finally I found a job.  Mayenah and Rhone went to

12  different daycares.  We arranged that in the morning I would

13  bring Mayenah and then he would bring Rhone, and Sathie and

14  Belucci -- the buses would take Sathie and Belucci.  Okay.

15  That day, that morning, because he was forcing me to have sex

16  with him and I didn't want to, so he told me I have to bring

17  both kids to the daycare.  And I told him if I had to take both

18  of them, I won't be at work on time.  Then he took my coat and

19  my boots and said, "You're not going to go anywhere; you're

20  going to stay here."

21  Q.  And when he took your coat and your boots, what did you

22  do?

23  A.  Then I watch him, I went to the room and took the phone

24  and called 9-1-1.

25  Q.  What happened when you called 9-1-1?

1  A.   The police came and asked what happened, and I explained

2  to him what happened -- I explained to them what happened.  So

3  they told him what he did is against the law given that this is

4  wintertime, you're not supposed to take her coat and her boots.

5  Then the police had him return to me my coat and my boots, and

6  they asked me what do I want to do.  Then I said, "I don't want

7  to live there anymore.  I'm suffering too much," so I let them

8  wait for me, I put some clothes in my luggage, and I took my

9  kids and I left.

10  Q.   Were the kids present during this entire incident?

11  A.   Yes.

12  Q.   Where did you take your children?

13  A.   I went to my mother-in-law's and my two brothers'.

14  Q.   Did you stay with your mother-in-law and your two brothers

15  permanently?

16  A.   I stayed with them from January 12th until September.

17  Q.   Where did you move to in September?

18  A.   I went to rent my own apartment with the children.

19  Q.   During this time how often did Manel see the children?

20  A.   Except for that date that we moved out, he only saw -- he

21  saw the kids if they were at his sister's on the weekends.

22  Q.   Did you and Manel ever live together again?

23  A.   Yes.

24  Q.   How did that come about?

25  A.   Okay.  He started talking to me.  He said he has become

1  more mature.  He has a lot of friends now.  His life has

2  changed.  "Please give me a chance for the sake of the kids so

3  we can be together."

4  Q.   Were there any other things that helped bring that about?

5  A.   Okay.  He insisted -- he persisted.  He said in Canada

6  there's a department that's called DPG, so if the children are

7  not being taken care of, the department will be involved.  "So

8  for the sake of the kids, let's reconcile so we can save the

9  kids."

10  Q.   When did you start living together again?

11  A.   On February/March.

12  Q.   And where were you?

13  A.   February/March 2012.

14  Q.   And where were you living?

15  A.   He came to me at the apartment that I rented.

16  Q.   And who was living in that apartment?

17  A.   Manel, me, and the four children.

18  Q.   How big was that apartment?

19  A.   It was two bedrooms, because at the beginning it was me

20  and the two children.

21  Q.   What was your relationship like with Manel when he moved

22  back in?

23  A.   At the beginning, given that I was working, it was normal

24  because he didn't bother me, at the beginning.

25  Q.   Did it stay that way, the relationship?

1  A.   Not for too long.  Not for that long.

2  Q.   What happened with your relationship?

3  A.   He started the same behavior.  He insisted he wants to

4  have relationship four, five times a week.

5  Q.   Can you be more specific about the behavior that he

6  started to exhibit?

7  A.   He started -- for instance, I would be in the kitchen, you

8  know, doing something in the kitchen.  He will drag me and

9  bring me to the room so he will do whatever he wanted to do.

10  Q.   Were the children ever there when this would take place?

11  A.   At the beginning he would wait when the kids are in school

12  to do that, but gradually he started doing it even in the

13  presence of the kids.

14  Q.   Which children were present?

15  A.   Mayenah, Rhone, Sathie and Belucci.

16  Q.   How did the children respond to Manel being there?

17  A.   He would tell them to "Go in your room."  If they knock at

18  the door he will say, "I'm busy," or he will tell them to go

19  outside and play by themselves.

20  Q.   Would he stop having sex with you when they would knock at

21  the door?

22  A.   No, he continued.

23  Q.   I want to shift gears a little bit.  How were the

24  children's health when they were living in Canada?

25  A.   At the beginning Mayenah wasn't sick too often.  Both of

1  them were not sick too often, but Rhone started to give us
2  problems.
3  Q.   What do you mean she started to give you problems?
4  A.   He will have bloody nose -- nosebleed.  His nose would
5  bleed often and a lot.  Then he didn't want to eat.  And he
6  will fall by himself.  Even nothing hit him, he will fall by
7  himself.
8  Q.   How did you react to RM showing these symptoms?
9  A.   I tried to bring him in the hospital so they could
10 diagnose what's wrong with.  When we got there, given that we
11 don't have insurance, they say we have to pay $678 so the
12 doctors can see him -- her.
13 Q.   Were you able to pay the money for the doctors to see her?
14 A.   No.
15 Q.   Who cared for RM during these episodes?
16 A.   He's always with me.
17 Q.   I want to make sure we're using the right pronoun.
18       THE INTERPRETER:  Right.  Can I say something?  In
19 Haitian Creole there's only one pronoun, so I don't know if I
20 can say -- sometimes I can say only one name, so there's only
21 one pronoun for both genders, males and females, so...
22 Q.   What did you do when you were unable to --
23       THE COURT:  Could we just -- in light of that, would
24 you just clarify which child you're talking about?
25 Q.   Ms. Herisse, can you just clarify, which child was showing

1  you symptoms?

2  A.   Rhone.

3  Q.   What did you do when you were unable to get help for RM?

4  A.   Given that we didn't have insurance and Rhone was getting

5  very skinny, she was losing weight, so I said since she's a

6  U.S. citizen, if she comes here, she will have better

7  healthcare, because she wasn't getting anything in Canada.

8  Q.   Did Mr. Mauvais ever help during these episodes?

9  A.   Given that Manel was working at night and I was there more

10  often, so I was the one who would take a wet towel and wipe her

11  nose.  But, you know, if he's there, he would ask what's going

12  on, but I was the one primarily in charge of taking care of

13  Rhone.

14  Q.   You said that you wanted to send her to the United States

15  because she was a U.S. citizen.  Did you end up doing that?

16  A.   Yes.

17  Q.   How did you do that?

18  A.   One of my aunts who usually travels to Canada, I explained

19  that problem to her.  And I said, "Here's what's going on with

20  Rhone.  If you can come and help me out with her."

21  Q.   And did your aunt come?

22  A.   Yes.

23  Q.   Which aunt came?

24  A.   Ann Christina Herisse.

25  Q.   Where did your aunt stay when she came to Canada?

| | |
|---|---|
| 1 | A.   She stays in our house. |
| 2 | Q.   And how long did your aunt stay? |
| 3 | A.   She spends a weekend. |
| 4 | Q.   Where did -- |
| 5 | A.   Three, four days. |
| 6 | Q.   Where did your aunt sleep when she came to the United |
| 7 | States? |
| 8 | A.   You mean in Canada? |
| 9 | Q.   Excuse me.  You're right.  In Canada.  She came to visit |
| 10 | you. |
| 11 | A.   We gave her our bedroom. |
| 12 | Q.   Where did you sleep? |
| 13 | A.   So given that Manel works at night, so I put a mattress in |
| 14 | the living room and sleep there, where Belucci usually sleeps. |
| 15 | Q.   Did anybody else sleep with you? |
| 16 | A.   Manel sleeps on the sofa, the four children and my aunt |
| 17 | was in the house. |
| 18 | Q.   How did Manel treat you when you were together in the |
| 19 | living room? |
| 20 | A.   Okay.  When I was on the sofa -- when I was on the |
| 21 | mattress on the floor and he was on the sofa and he started |
| 22 | to -- wants to have sex with me, and I repeatedly say we have |
| 23 | to have respect for Belucci.  We don't know what's going to go |
| 24 | on in his mind. |
| 25 | Q.   And what happened? |

1  A.   When I called Belucci, Belucci wasn't sleeping, and he

2  stopped for five minutes, and then he started again until he

3  found what he wanted.

4  Q.   What do you mean by that?

5  A.   He had sex with me.

6  Q.   And where was Belucci at this time?

7  A.   The mattress was in front of the bed, Belucci's bed.

8  Q.   And how far away was Belucci?

9  A.   Very close, because if I lift up my hand, I will touch the

10 bed.

11 Q.   When did your aunt leave Canada?

12 A.   August 26th.

13 Q.   Who, if anyone, did your aunt leave with?

14 A.   A friend drove, and with Rhone.

15 Q.   When, if ever, was Rhone able to see a doctor?

16 A.   When my aunt arrived here, she called the doctor.  And she

17 was about to get an appointment for October 7th.

18 Q.   Why did it take until October 7th for her to get an

19 appointment?

20 A.   Because he said there was no space.

21 Q.   Your aunt took RM to the United States at the end of

22 August.  What prompted you to come to the United States in

23 September?

24 A.   The last thing that happened.  Something happened on

25 September 9th.  I was in the living room watching TV and the

1  kids were sleeping.  Manel came and he said he wants to have

2  sex tonight.  I said, "No, I don't feel well.  I'm tired,"

3  because I was very stressed at that time.  Every time he comes

4  to the house, I'm afraid because I know he's going to ask for

5  that.  When I don't want to, he grabs my arm, he turns off the

6  TV and brings me to the bed, and he had sex with me.

7  Q.    After this incident, what were you thinking?

8  A.    Then I said, "I cannot continue in my life like this.  I'm

9  not to be here."

10  Q.    What did you decide to do?

11  A.    Okay.  I said to myself one of the reasons that I decided

12  to come to Canada is because of Mayenah, so I'm not going to

13  stay here.  I'm going to take Mayenah.

14  Q.    When did you leave?

15  A.    In the middle of the night of 13th-14th of September.

16  Q.    Where did you go?

17  A.    I came here to the United States.

18  Q.    Where in the United States did you go?

19  A.    Over my aunt's house in Boston, Mattapan.

20  Q.    When you arrived in Boston, did you try to get help of any

21  sorts based on what happened to you in Canada?

22  A.    Yes.

23  Q.    What kind of help did you get?

24  A.    Okay.  I was very stressed; I was panicking.  So I went to

25  an association that takes care of women who are abused.  So

1    they took me to court, and then I went to a judge who gave me a

2    restraining order.

3    Q.    Ms. Herisse, can I direct your attention to Exhibit K

4    which is in the binder.  Do you recognize it?

5    A.    Yes.

6    Q.    What is it?

7    A.    That's the restraining order that the judge gave me.

8    Q.    Why did you get it?

9    A.    Because Manel was putting pressure on me.  He was calling

10   me, he wants the kids.

11   Q.    Did you ever return to Canada?

12   A.    No.

13   Q.    Why didn't you return with your kids to Canada?

14   A.    As a mother I have to think of the kids' safety.  Mayenah

15   wasn't safe in Canada, so I have no reason to return to Canada.

16   And also, because of her health -- in Canada you have to have

17   health insurance, so because of her health she had to stay

18   here.

19            MR. PASTAN:  No further questions.

20            MR. BARACH:  Judge, can I have a five-minute bathroom

21   break?

22            THE COURT:  All right.  We'll take a short break.

23            THE CLERK:  All rise for the Court.  The Court will

24   take a short recess.

25            (The Court exits the courtroom and there is a recess

1  in the proceedings at 12:07 p.m.)

2            THE CLERK:  All rise.

3            (The Court enters the courtroom at 12:22 p.m.)

4            THE CLERK:  For a continuation of the motion hearing.

5  Be seated.

6            THE COURT:  Mr. Barach?

7                    CROSS-EXAMINATION

8  BY MR. BARACH:

9  Q.   Good afternoon.  Isn't it true that RM is four years old?

10 A.   Yes.

11 Q.   And isn't it true that RM was living in Canada for three

12 and a half years?

13 A.   Yes.

14 Q.   And isn't it true that MM is age eight?

15 A.   Yes.

16 Q.   And isn't it true that MM has been living in Canada for

17 nearly half of her life, for three and a half of her eight

18 years?

19 A.   Yes.

20 Q.   And isn't it true that you've been residing in Mattapan

21 with MM and RM without permission of their father?

22 A.   Yes.

23 Q.   And isn't it true that you had separated from Manel in

24 Canada on or about January or February of 2011?

25 A.   Yes.

1    Q.  In fact, you were not living in the same home with Manel,

2    RM and MM, since on or about 2011?

3    A.  2011?  No.

4    Q.  In fact, in 2013 you were living in a separate residence

5    than Manel, RM and MM, correct?

6    A.  At the beginning of 2013 we were not living together.  As

7    of March 2013 he started living in the house.

8    Q.  Do you recall filing an authorization for RM to travel to

9    the United States with your aunt?

10   A.  Yes.

11   Q.  And do you recall listing your address where you were

12   living on that declaration?

13   A.  Yes.

14   Q.  And, in fact, isn't it true that the address that you

15   listed on your application is not the same address as Manel's

16   address, correct?

17   A.  In the paper, yes.

18   Q.  Isn't it true that from 2011 until 2013 Manel would

19   primarily see the children on weekends?

20   A.  Well, when his sister takes the kids or when it's during

21   vacation, but it's where...

22   Q.  So he went to see them on a regular basis, correct?

23   A.  No.

24   Q.  In fact, isn't it true that his sister would take the

25   children on weekends?

A.   Not every weekend.  She will spend a month without having
the kids.

Q.   But she would take the children for you, wouldn't she?

A.   Once in a while, yes.

Q.   And Manel would see the children when she would take the
children for you, correct?

A.   Yes, that's what he told me.

Q.   And isn't it also true that Manel would also sometimes
take the children for you and visit them during the week?

A.   No, the kids were with me.  I was the mother.  And the
father, he didn't give anything for them; he didn't take care
of them.

Q.   So it's your testimony that Manel never spent any time
with the children, correct?

A.   When we were separated, so when the kids will go to the
aunt's house, that's when he will see them.

Q.   In fact, MM was living with Manel in Haiti prior to the
earthquake, correct?

A.   Yes.

Q.   And, in fact, Manel took MM to Canada in February of 2010,
correct?

A.   Yes.

Q.   And, in fact, in March of 2010 you joined Manel and MM and
brought RM to Canada, correct?

A.   I was with Rhone.  I went to Canada with Rhone.

1    Q.   So it's correct in March of 2010 you took RM to Canada,

2    correct?

3    A.   Yes.

4    Q.   And you lived with RM, Manel and MM in Canada in his

5    sister's house, correct?

6    A.   During four months, yes.

7    Q.   And, in fact, your oldest daughter, MM, had been attending

8    school in Canada since 2011, correct?

9    A.   Correct.

10   Q.   In fact, she's currently enrolled in grade two at her

11   school, the La Dauversiére school in Canada, correct?

12   A.   Yes.

13   Q.   And your daughter, MM, was involved in some modeling,

14   correct?

15   A.   Yes.

16   Q.   And she was involved in figure-skating, correct?

17   A.   No.

18   Q.   And isn't it true that she attended Sunday school?

19   A.   So it's not regular.  It doesn't happen continuously.  So

20   it's when she happens to be with the aunt and the aunt goes to

21   church, but it's not something that goes on continuously.

22   Q.   But she does attend Sunday school with her aunt and her

23   family, correct?

24   A.   Yes, that's what he told me.

25   Q.   And isn't it true that your youngest daughter was

1  attending a pre-kindergarten program from April until August of

2  2013, correct?

3          THE INTERPRETER:  What year?

4          MR. BARACH:  2013.

5          THE WITNESS:  Mayenah was in a day camp.  That was

6  only July and August.

7  BY MR. BARACH:

8  Q.   My question is about RM.  Isn't it true that -- I'll

9  repeat the question for you, ma'am.

10         Isn't it true that RM was attending a preschool program

11  from April 2013 until August of 2013 at the Institute

12  Préscolaire de Montréal?

13  A.   Yes.

14  Q.   And isn't it true that as of December 3rd -- December 12,

15  2013, you had not enrolled RM in a similar pre-kindergarten

16  program in Boston?

17  A.   She's on a waiting list.  RM is on a waiting list.  He's

18  registered -- okay -- ABC.  ABC program.  On a waiting list at

19  the ABC program.  ABCD.

20  Q.   You filed an application to enter the United States on or

21  about March 1st of 2010.  Is that correct?

22  A.   For the United States?  What kind of application?

23  Q.   Well, turning your attention to Exhibit J.  Actually, you

24  applied about -- on or about July 8, 2010.

25          THE INTERPRETER:  J, right?  "J" as in "juice"?

```
 1          MR. BARACH:  "J" as in "juice."
 2   BY MR. BARACH:
 3   Q.   And that application to apply to be a citizen of the
 4   United States was rejected, correct?
 5   A.   Yes.
 6   Q.   And, in fact, isn't it true that it was rejected because
 7   you failed to provide additional information despite the fact
 8   that you were given an additional 30 days, correct?
 9   A.   Okay.  This one -- they gave me an appointment to have a
10   fingerprint on March 20th.  So that was the date after.  I
11   don't remember exactly the date, but I had to go to Canada.  So
12   that was after -- sometime after.  I don't recall the date.
13   Q.   But you never submitted any additional information,
14   correct?
15   A.   Because I had to go to Canada.  I wasn't here.
16   Q.   Right.  Exactly.  You went to Canada, correct?
17   A.   Yes.
18   Q.   And isn't it true that on August 23rd, you and Manel
19   authorized your aunt to travel with your youngest daughter to
20   the United States from on or about August 25, 2013, until
21   September 20, 2013, correct?
22   A.   Yes.
23   Q.   And isn't it true that the authorization called for RM to
24   return to Canada on or about September 20, 2013?
25   A.   Yes.
```

1   Q.   And isn't it true that RM has not returned to Canada as

2   required by the authorization?

3   A.   Okay.  The authorization we requested was for her to see a

4   doctor to have medical care, so she couldn't have returned

5   without seeing -- having the medical care.

6   Q.   But isn't it true that the authorization says, and I

7   quote, "We authorize our child, RM, to" -- "residing at" -- "in

8   Mattapan, Massachusetts, from Montreal, Canada, Boston, USA,

9   and from Boston, USA, back to Montreal, Canada, on or about

10   August 25, 2013, and arrival around September 20th, 2013"?

11   A.   Yes.

12   Q.   And isn't it true that at no time did Manel give you

13   authorization to travel to Boston for MM -- with MM, correct?

14   A.   No.

15   Q.   So isn't it true that you traveled with MM to Boston,

16   correct?

17   A.   Yes.

18   Q.   And isn't it also true that Manel, through the State

19   Department, has requested that you return both RM and MM to

20   Canada?

21   A.   Yes.

22   Q.   And isn't it also true that you failed to return both

23   children to Canada, correct?

24   A.   No.  Their health comes first.

25   Q.   Well, that's not my question.  You have not returned them

1   to Canada, correct?

2   A.   No.

3   Q.   You never sought a court order to keep Manel away from the

4   children in Canada. Isn't that true?

5   A.   No.

6   Q.   In fact, you never sought a court order to keep Manel away

7   from you in Canada?

8   A.   No.

9   Q.   In fact, you never went to the Canadian authorities to

10   file charges that Manel had sexually abused you, correct?

11   A.   No.

12   Q.   You filled out an affidavit in order to obtain a temporary

13   restraining order in Boston, Massachusetts, correct?

14   A.   Yes.

15   Q.   And do you recall that that affidavit form had

16   instructions on it?

17   A.   Yes.

18   Q.   And, in fact, you had some assistance in filling out the

19   affidavit when you obtained the restraining order in Boston,

20   correct?

21   A.   Yes.

22   Q.   And you were required to sign the affidavit under the

23   pains and penalties of perjury, correct?

24   A.   Yes.

25   Q.   In fact, you recall that the instructions included the

1   following:  "The judge requires as much information as

2   possible, such as what happened, each person's actions, the

3   dates, locations."  Do you recall that?

4   A.   Yes.

5   Q.   And you had this order extended, correct?

6   A.   Yes.

7   Q.   And Manel was not at the first hearing, correct?

8   A.   No.

9   Q.   And Manel was not present at the extension of the

10  restraining order, correct?

11  A.   No.

12  Q.   And you wrote in that affidavit, "He sexually and verbally

13  abused me on many occasions," correct?

14  A.   Yes.

15  Q.   But isn't it true, ma'am, that you didn't list one single

16  date or specific time when Manel had sexually abused you?

17  A.   When I was talking to the judge, I said the date,

18  September 9th -- the date of September 9th, that's the date

19  that prompted me to make the decision.

20  Q.   September 9th.  Isn't it true that Manel was married to

21  Sandra?

22  A.   Okay.  That's a business marriage, so I don't consider

23  that as a normal marriage.

24  Q.   Okay.  Referring back to your affidavit, do you recall,

25  "He wants me to go back to Canada to live with him.  And to

1  make matters worse, he's married someone else"?

2  A.   Repeat again?

3  Q.   Well, if you want to take a moment to refresh your

4  recollection, you could look at the affidavit, which is Exhibit

5  K.   And why don't you look at the last paragraph.

6           MR. PASTAN:  Your Honor, objection.  Completion.

7           THE COURT:  I'm sorry?

8           MR. PASTAN:  On completion to read the rest of the

9  sentence.

10          THE COURT:  You can do that on redirect.

11          MR. PASTAN:  Okay.

12  BY MR. BARACH:

13  Q.   Does that refresh your recollection that you wrote in your

14  affidavit that "to make matters worse, he's married to someone

15  else"?

16  A.   Yes.

17  Q.   And isn't it true that you testified earlier that you

18  claim that Manel sexually abused you on September 9th, 2013,

19  correct?

20  A.   Yes.

21  Q.   But isn't it also true this affidavit, where you're asked

22  to put specific dates and times, you didn't list an incident on

23  September 9 to obtain this restraining order, correct?

24          MR. PASTAN:  Objection.

25          THE COURT:  Overruled.

1    THE WITNESS:  In this one I don't see September 9th.

2    There's no space to write everything.  There was so much to

3    write.

4    BY MR. BARACH:

5    Q.   And you had assistance from the battered women's clinic?

6    A.   Yes.

7    Q.   And you understood the instructions, correct?

8         MR. PASTAN:  Objection.

9         THE COURT:  Overruled.

10   BY MR. BARACH:

11   Q.   And you understood that actually the affidavit says at the

12   bottom, "If more space is needed, attach additional pages,"

13   correct?

14   A.   No.

15   Q.   It isn't true that it says, "If more space is needed,

16   attach additional pages"?

17   A.   I just saw it now.

18   Q.   The first sentence you wrote in that affidavit was, "I was

19   living in Boston with my children," correct?

20   A.   Yes.

21   Q.   And you were referring to the time right before you moved

22   to Canada in 2010, correct?

23   A.   Yes.

24   Q.   But that sentence wasn't true, correct?

25   A.   That sentence?  The sentence that I was living in Boston

1  before I went to Canada?

2  Q.  No, the sentence -- the very first sentence that says "I

3  was living in Boston with my children."

4  A.  Yes.

5  Q.  In fact, you were only living in Boston with your youngest

6  daughter, RM, correct?

7  A.  With one.

8  Q.  In fact, in 2010 your oldest daughter was living with

9  Manel in Canada, correct?

10 A.  Yes.

11 Q.  And you also wrote that your boyfriend, the father of the

12 kids, "asked me to come to Canada," correct?

13 A.  Yes.

14 Q.  And that also wasn't exactly correct?

15 A.  Yes, that's true.

16 Q.  Isn't it true --

17 A.  He asked me to come to Canada.

18 Q.  But isn't it true that MM at that time that you're

19 referring to was living in Canada with Manel, correct?

20 A.  Yes.

21 Q.  And isn't it also true that you were living in Boston with

22 RM separate and apart from MM and Manel?

23 A.  Yes.

24 Q.  And so when you wrote "I went there with my kids," that's

25 not exactly true, is it?

1  A.   I don't write English well.  It's probably an error,

2  because Rhone was with me, and I went to Canada with her.

3  Q.   In this affidavit you did not state one incident where

4  Manel had physically harmed RM and MM, correct?

5  A.   When?

6  Q.   In this affidavit before you, you stated under the pains

7  and penalties of perjury -- you did not list one single,

8  solitary incident where Manel harmed RM and MM, correct?

9  A.   No, he doesn't hurt them.

10        MR. BARACH:  Thank you.  I have nothing further.

11        THE COURT:  Mr. Pastan?

12        MR. PASTAN:  Very briefly, your Honor.

13                    REDIRECT EXAMINATION

14  BY MR. PASTAN:

15  Q.   Ms. Herisse, where were you living when you lived in

16  Canada?

17  A.   Montreal, Quebec.

18  Q.   And who were you living with?

19  A.   Manel, myself and the four children.

20  Q.   Now, I want to direct your attention to Exhibit G.  Why

21  are there two separate addresses on the declaration?

22  A.   So officially Sandra -- Manel is married to Sandra for his

23  papers.  So all the papers that are coming in, so he had them

24  go to Sandra's house so to prove that he's living there.

25  Q.   Why did you sign a declaration even though you don't

1  believe that Manel actually lives there?

2  A.   I wanted Rhone to come here because of her declining

3  health.  So I didn't want to have any problems with the address

4  because I wanted Rhone to come here because of her declining

5  health.

6  Q.   And why did you authorize Rhone to come to Canada?

7  A.   You mean the United States?

8  Q.   I'm sorry.  The United States.

9  A.   Always for her health, because I want her to be here.  She

10  didn't have medical insurance, so they only had a nurse see her

11  because she had no medical insurance, so the doctor will not

12  see her.

13  Q.   And I would like to turn your attention next to Exhibit K.

14  Did you have the help of an interpreter to fill out this

15  affidavit?

16  A.   Yes, there was somebody with me.

17  Q.   Did that person explain to you what you were supposed to

18  put on the page?

19  A.   That person told me there was not enough space, just write

20  the most important things.  Write on what's meaningful.

21  Q.   Did you rely on that interpreter's statement to you in

22  creating this statement?

23  A.   No.

24  Q.   Did you follow the interpreter's directions when creating

25  the affidavit?

1    A.    Yes.

2    Q.    I just want to direct your attention to the last sentence

3    that Attorney Barach had you look at of the affidavit.

4              THE INTERPRETER:  The last sentence?

5              MR. PASTAN:  The last sentence of the affidavit.

6    BY MR. PASTAN:

7    Q.    Did Attorney Barach read to you the entire sentence that

8    you had written?

9    A.    The lawyer, right?

10   Q.    Yes.

11   A.    There was no attorney.  When?

12   Q.    No.  No, Mr. Barach.

13   A.    Yes, he had me read part of it.

14   Q.    What's the rest of the sentence about?

15   A.    He wants me to continue being his sex slave.

16   Q.    Did you read the entire last sentence?

17   A.    "To make matters worse, he married someone else and still

18   wants me to be his sex slave."

19             MR. PASTAN:  No further questions.

20             MR. BARACH:  Nothing further.

21             THE COURT:  All right, Ms. Herisse.  You may step

22   down.

23             (The witness is excused.)

24             MR. PASTAN:  Your Honor, if I may at this time request

25   permission to read four -- three questions and three answers

1 from the deposition, cross-examination.

2 THE COURT:  Okay.  Okay.

3 MR. BARACH:  No objection.

4 MR. PASTAN:  On page 32, lines 14 through 19.

5 "QUESTION:  Mr. Mauvais, it's my understanding that

6 Rhone has had some medical problems in Canada?

7 "ANSWER:  No.

8 "QUESTION:  She never had any sort of special medical

9 needs?

10 "ANSWER:  No."

11 Pages 37, lines 4 through 9:

12 "QUESTION:  Mr. Mauvais, have you ever had to

13 discipline your children or child for inappropriate sexual

14 behavior?

15 "ANSWER:  The twins, yes.  But the others, they're

16 younger, so they don't know that much about sexuality."

17 Thank you, your Honor.

18 THE COURT:  Okay.  Do you have another witness?

19 MR. PASTAN:  Yes.

20 THE COURT:  How long will that person be?

21 MS. WARE:  Maybe ten minutes, your Honor.  Ten or 15

22 minutes.

23 THE COURT:  And then you have Dr. Newberger as well?

24 MR. PASTAN:  Yes.

25 THE COURT:  Well, I think we're close enough to one

o'clock which is the usual recess time for lunch.  We'll resume at 2:30.  I have another matter at two that I have to deal with, but I don't think that will take too long, so we'll resume.  And you think on that we'll be able to finish the evidence today?

MR. PASTAN:  Yes, your Honor.

MR. BARACH:  Yes.

THE COURT:  All right.  So we'll resume at 2:30.

THE CLERK:  All rise for the Court.  The Court will be in recess.

(The Court exits the courtroom and there is a recess in the proceedings at 12:55 p.m.)

THE CLERK:  All rise.

(The Court enters the courtroom at 3:26 p.m.)

THE CLERK:  For a continuation of the motion hearing.  Be seated.

THE COURT:  All right.  Good afternoon.  I'm sorry.  That took a lot longer than I anticipated it was going to be.  I misestimated.

All right, Mr. Pastan.

MR. PASTAN:  Your Honor, the respondent calls Dr. Newberger.

MR. BARACH:  And, Judge, again, I'd like to renew our objections to the testimony.  Our motion's based on the fact that the rule itself wasn't fully complied with.  There's no

written report of this expert witness.  He wasn't disclosed
until the latest possible date.

And, third, there's the issue of privilege.  Both
Massachusetts and the federal rules have a privilege here that
I would submit to the Court has been violated by the lack of
appointment of a guardian ad litem to address the issue whether
a psychiatrist/psychotherapist privilege exists.  Generally in
custody proceedings, which I think is akin to what is before
the Court this afternoon, when there is a psychiatrist that
speaks to children and they have made disclosures in a custody
dispute, those disclosures need to be addressed by a competent
party, which is generally an attorney that's appointed by the
court to address that.  That didn't happen here in this case.

So based on those submissions, your Honor, I would
stand on my submissions, I would ask that the expert be
excluded from testifying.

MR. PASTAN:  Your Honor, I would submit that no part
of Dr. Newberger's opinion is based upon communication with the
children.  There is no issue of privilege here.  I want to
bring before the Court that this is not a custody hearing; this
is a decision under the Hague -- under the 13(b) defense, and
so the rules of custody hearings don't apply.  And it would be
improper for us to treat this as though it were a custody
proceeding.

Dr. Newberger should be given leave to stay because

1   he's testifying as to the central issue in the respondent's

2   defense, which is whether the kids will be subject to a grave

3   risk of physical or psychological harm if returned to Canada.

4        We've already heard evidence of sexual abuse, sexually

5   inappropriate behavior; we've heard evidence about the children

6   being subject to seeing their mother made to have sex with

7   their father, and these bring up deep psychological issues.

8   Dr. Newberger isn't going to testify as to any sort of

9   prescription or treatment, but is going to help us understand

10   better what the future risk of harm to those kids is if they're

11   returned to Canada.

12        THE COURT:  Okay.  The objection is overruled.  You

13   may call Dr. Newberger.

14        MR. PASTAN:  Thank you.

15           ELI HERBERT NEWBERGER, duly sworn

16        THE CLERK:  State your name and spell your last name

17   for the record, and keep your voice up, please.

18        THE WITNESS:  My name is Eli Herbert Newberger,

19   N-E-W-B-E-R-G-E-R.

20        THE COURT:  Go ahead.

21        MR. PASTAN:  Thank you.

22           DIRECT EXAMINATION

23   BY MR. PASTAN:

24   Q.  What is your profession, Dr. Newberger?

25   A.  I'm a pediatrician.

1 Q.   Can you describe a little bit about your educational

2 background, please?

3 A.   Sure.  After graduating from Yale College in 1962, I

4 attended Yale Medical School, graduating in 1966.  I then

5 completed an internship in internal medicine at the Yale-New

6 Haven Hospital.  And in July of 1967 I began a two-year period

7 of service as a Peace Corps physician, and I was assigned to

8 supervising maternal and child health program in a small

9 country in West Africa where I became deeply interested in

10 pediatrics.  And I continued my training in the interval 1969

11 through 1972 at Children's Hospital in Boston.

12      In the course of my training at Children's Hospital I

13 organized its first child protection team.  And then when I

14 became a member of the senior staff in 1972, I founded a unit

15 that offered clinical consultation on an inpatient and

16 outpatient basis, a center for training and research on child

17 abuse and neglect and a variety of related pediatric

18 conditions.

19      And I directed that program and served as the medical

20 director of the child protection team until the end of December

21 1999.  In that year, I published a book called *The Men They*

22 *Will Become* on boys' character development, and I shifted my

23 career and my research focus, all the while maintaining an

24 interest in child abuse, domestic violence and related

25 problems.

1    Q.    Are you board certified?

2    A.    Yes, I was certified by the American Board of Pediatrics

3    in 1973.

4    Q.    Do you specialize in any fields within pediatrics?

5    A.    Within pediatrics I have two subspecialties:  child

6    development, which is sometimes called behavioral and

7    developmental pediatrics, and child abuse and neglect.

8    Q.    Have you testified as a pediatrician and as a psychiatrist

9    before?

10            MR. BARACH:  Your Honor, if I may, I'll stipulate that

11    Dr. Newberger is an expert so we could move this along.

12            MR. PASTAN:  Okay.  Thank you.

13    BY MR. PASTAN:

14    Q.    In cases where you've testified involving sexual behavior

15    of minors, what generally do you do to investigate the

16    situation and assess it?

17    A.    Prior to my giving testimony in a court, I review the

18    entire of the available corpus of medical records, I interview

19    the parents where possible, and I conduct interviews and

20    physical examinations of the children who are involved.

21    Q.    With respect to this case what, if any, of these things

22    did you do?

23    A.    In this case, first I talked with you and your colleague,

24    Verner Moore, to get a sense of whether the case met my own

25    ethical standard for whether I would give testimony; I reviewed

1  all of the available Boston Medical Center records on Mayenah

2  and Rhone.  I then invited the children, their mother, their

3  aunt, Christine, to my home in Brookline where I do my

4  assessments, and you were there, and I interviewed both adults

5  in French -- I happen to speak fluent French in the course of

6  my Peace Corps service in a Franciscan country -- and then

7  gathered detailed history on the children's health,

8  development, and some of the adverse exposures that the

9  children had experienced.  And subsequently, then, I debriefed

10  with you.  That was the nature and scope of my work.

11  Q.  As a result of this interviewing, did you obtain any

12  information that helped you form any opinion?

13  A.  Yes.  First, with regard to the interviews of the

14  children, there was nothing of probative importance.  Those

15  were brief interviews prior to and in the course of my physical

16  examinations.  But from the mother, Nathalie Herisse, and her

17  aunt, Ann Christina Herisse, I got a very good and vivid

18  corroboration of the evaluation of Mayenah at Boston Medical

19  Center, and then my own firsthand interview information about

20  the sexual abuse of Mayenah and both children's exposures to

21  the forcible circumstances in which the mother had to endure

22  nearly daily sexual assaults by their father, and as well,

23  their experience with their eight-year-old half siblings in the

24  apartment that they shared in Canada who perpetrated several

25  assaults.  But one notable one was where the two twins

appeared, from what I was told, to collaborate in an attempted

sexual assault where the girl child spread Mayenah's legs and

the boy waved his penis in her face and attempted to put his

penis into her vagina.

Q.    As a result of reviewing the children's medical records,

did you obtain any information relevant to you?

A.    Yes.  Both children have notable medical records.   In

Rhone's case, for some time it's been known, it's my

understanding, prior to her coming to Boston, that she had a

form of anemia and had a tendency to bleed easily.  These, to

my understanding, were not given specialist evaluations in

Canada, but have in Boston as recently in the hematology clinic

at Boston Medical -- pediatric hematology clinic at Boston

Medical Center on January 10.

       And in Rhone's situation, she has a complex hematological

disorder that involves both a bleeding tendency associated with

a marked deficit in platelets.  These are the components of the

blood that represent small cells that assist in the clotting of

blood.  And her blood levels of platelets are in the order of

the 10th to 25th percentile of what they should be, setting her

up for potential hemorrhage if she has any substantial trauma.

Right now what she has is elaborate nosebleeds, often not

precipitated by any upper respiratory infection or anything

else.

       And in addition, she has an anemia characterized by very

small red blood cells.  Now, very frequently that is associated

with iron deficiency.  And she is being treated with iron in

anticipation that that may have some therapeutic effects.  But

there are some outstanding chemical studies and other

laboratory studies having to do with the clotting of the blood

and the nature of the anemia which were not available to me at

the time that the January 10 medical record was created.  But

this is still in the process of being evaluated and requires

expert and continuing hematological care to deal with both the

bleeding propensity and with the anemia to assure her good

health.

In Mayenah's case, she was seen for general pediatric care

and updating her immunizations and the like.  In the setting of

a complaint of a vaginal discharge, this was evaluated.

Fortunately, there were no anatomical nor infectious

concomitants of this discharge, which then subsequently

disappeared.  But on the interviews conducted by the Boston

Medical Center staff, there was great concern and there's

abiding concern about the psychological impacts of the

exposures that she has endured that have left her with certain

traumatic stress artifacts, the three principal exposures being

her personal sexual abuse, her witnessing of her mother's being

forced into sex, and associated with that, a tremendous anxiety

for her mother.

Posttraumatic stress is defined as having been exposed to

1  a stress that affects you personally or someone whom you deeply

2  care for or depend on for your care.  And those accrue.  And

3  then in addition to the tragic circumstances of the hurricane

4  in Port-au-Prince where the family had to live in the street

5  after their house was destroyed, the social work department at

6  Boston Medical Center, noting appropriately that a series of

7  traumas often accrues a magnification of traumatic experience,

8  picked up some of the symptoms that she manifested in the

9  clinic, and recommended that she have continued psychotherapy

10 to deal with these traumatic artifacts.

11 Q.   You said that the medical records documented a history of

12 sexual abuse.  Can you define what sexual abuse is?

13 A.   Yes.  In the Commonwealth of Massachusetts, the public

14 definition of sexual abuse is what's contained in Chapter 119,

15 Section 51(a) and following, which require physicians and other

16 people who have responsibility for the care of children to make

17 reports of suspected abuse of various forms to the Department

18 of Children and Families for investigation and work to ensure

19 the protection of children.

20      So the public definition here of sexual abuse includes

21 fondling, insertion of objects, fingers or digits into

22 children's vaginas and rectums or intrusions of similar kinds

23 to boys.  It includes as well exposing children to sexual

24 activity that is of risk to their health and their development,

25 to including them in the development of media in which they're

1    exploited and may be exploited for commercial gain, and also,

2    engaged in sex work which can, as well, be seen as part of the

3    panoply of sexual abuse behaviors.

4         More ambiguous and very frequently not discerned and

5    conceptualized within the public requirements for the reporting

6    of sexual abuse are things like being exposed to adult nudity

7    or being exposed to a sexualized environment, or having

8    exposure to media which may be sexually stimulating as part of

9    a process of grooming a child into accepting sex between

10   children and adults.  And there there's disagreement on the

11   part of researchers and of clinicians in which there's not yet

12   any clear resolution.  But now there is a national standard --

13   reporting standard for what should be included in public

14   definitions, and Massachusetts now comports with that of other

15   states.

16   Q.   Dr. Newberger, you told us a lot of what you had to learn

17   from these standards and reviewing the medical records.  Based

18   on your time with Ms. Herisse, with the aunt, the children and

19   reviewing the medical records, were you able to form any

20   opinions to a reasonable degree of medical certainty?

21   A.   Yes.

22   Q.   Starting with MM, what risks, if any, would she face if

23   returned to Canada?

24   A.   MM almost certainly would be exposed to similar assaultive

25   behavior on the part of her half siblings as she experienced

1  before, and furthermore, would almost surely be exposed to an

2  environment in which there is forced sexual intrusion on adults

3  and in children, an environment as well where the response on

4  the part of her father to the sexual behavior by his two twins,

5  the nearly-nine-year-old twins, has been to really quite

6  violently punish them, the boy more than the girl.

7     This also elevates risk in two ways:  First, with regard

8  to boys, this kind of harsh chastising very frequently has the

9  exact opposite effect of what the adults intend.  The

10  powerlessness that boys experience in the face of this kind of

11  what was described to me really intense beating with a belt,

12  for very many boys to recover from this kind of experience and

13  seek a sense of mastery, they become more dominant and more

14  aggressive toward other children.

15     With regard to MM, my sense is that it would accrue risk

16  to her from this boy, and also potentially from her father

17  himself who she would never know might turn on her if she did a

18  transgression similar to this.  And where in situations she has

19  seen her own mother assaulted in the service of pulling her

20  into the bedroom so he could have sex with her, or actually

21  having sex with her in the room where the children were

22  sleeping on one occasion, the children awakened at the time

23  that he insisted on having sex in the room where the children

24  were sleeping on mattresses on the floor of their common room.

25     And the other downside for girls who have previously been

1  sexually abused is that, for girls particularly, an antecedent

2  experience of sexual trauma very often make some vulnerable to

3  subsequent experiences of sexual trauma.  There's now an

4  extensive body of study of this phenomenon.  Unlike with boys,

5  where boys who have been victimized very often become

6  victimizers.  With girls, they very often then may have a

7  lifelong vulnerability to assaults of various kinds.

8       So one of the issues for MM is to be able to recover from

9  her past traumatic exposures and to be protected from

10  subsequent traumatic exposures.

11      My review of the deposition that you and your brother

12  counsel conducted with the father suggested a kind of ignorance

13  and detachment from this girl and her sister's physical and

14  psychological needs, but I didn't have any opportunity to

15  interview this man, much less to formulate any more deep

16  impressions.  But I think that they would both be in physical

17  and psychological danger if they were to be repatriated to his

18  care.

19  Q.   You talked about potential physical harm and potential

20  risk of future sexual abuse.  You started to talk about

21  psychological harm.  Could you go a little deeper into what

22  exactly the risk of psychological harm is and why it may or may

23  not be specific to her returning to Canada?

24  A.   Well, specifically with regard to MM, she's already having

25  problems in school, where she spaces out, to use the term of

art, where she detaches herself from reality, stares ahead, seems to be preoccupied by something, and no one knows quite what it is.  As the people at Boston Medical Center I think quite rightly discerned, this is very frequently a harbinger of subsequent traumatic stress artifacts.

Here's a girl who, you know, in the middle of her school years, at seven, really, has to be able to focus her attention on what's before her in the classroom.  As well, she needs to be protected from abuse by other children and from adults because, were she to be revictimized, the impacts would be larger for her than there would be on a girl, say, seven who hadn't previously had the traumatic experiences that she's had.

So for MM, in my view, there are very substantial potentially lifelong psychological risks.  And what the task now is to assure that with psychotherapy and her protection and her mother's loving care and her aunt's diligent involvement in her life as well, that she has a real chance to grow healthfully and well.  Further adverse exposures would derail this developmental progress.

With her sister, R, the psychological risks can't be more deeply discerned.  At the age of four, fortunately, she's not displaying any idiosyncrasies or discrepancies from the normal course of development as discerned by the developmental assessment at Boston Medical Center, which is a good thing, notwithstanding her having been in the marital bed when her

mother was being assaulted and being sufficiently aware of what had happened.

In one of these assaults the mother reminded the father that the child was right there, and he just threw a blanket over her. Well, subsequently she asked her mother why he was doing these things and why she was moving like that. That's what this girl, you know, before the age of four, asked her mother.

So clearly she has had exposures in that household that are not good for kids. To send her back would presumably expose her to similar kinds of intrusive experiences that her sister had had.

And in her case, the other thing is I can't emphasize sufficiently how this girl needs expert pediatric hematology care, both to provide a clear diagnosis and a path for treatment and protection, lest she have a bleeding episode or episodes that could be very problematic. It's been fortunate that she's here and that her nosebleeds haven't yet matured into anything else.

And also, I mentioned that her physical examination doesn't disclose any skin signs that suggest something like hemophilia or von Willebrand disease or leukemia where often the skin signs display a propensity to bleed.

So, so far her physiology and her blood-clotting system appears to be in some balance, but her low platelets clearly

1  signify risk and possible danger.

2  Q.   Based on your personal knowledge, was RM able to get

3  adequate treatment for this disorder in Canada?

4       MR. BARACH:  Objection as to the phrase.  It's

5  based --

6       THE COURT:  I'm sorry?

7       MR. BARACH:  Objection.  It's based on his opinion,

8  not his personal knowledge.  He's testifying as an expert.

9       THE COURT:  Well, you need a foundation, I think, of

10 what --

11 BY MR. PASTAN:

12 Q.   Based on your interviews, was RM able to get adequate

13 medical treatment for this disorder?

14 A.   I'm sorry.  I don't know -- adequate medical treatment in

15 Canada?

16 Q.   In Canada for this disorder.

17 A.   The difficulty is that getting medical treatment is often

18 mediated through a parent, and if the parent cares enough and

19 the resources are there and the parent insists on the right

20 care being given, then a child of course can get good medical

21 care in Canada.  What I worry about is that were the mother

22 with these children to be repatriated to Canada, similar

23 controlling activities as have occurred before could well

24 occur:  her cell phone taken, her coat, her boots taken so she

25 can't leave the house, or leave the house with the children.

1    And if the father's deposition is any harbinger of things to

2    come were this to happen, just a lack of serious attention.

3    The problem with R's blood dysplasia is it doesn't, except for

4    the nosebleeds, telegraph any continued medical problem.  She

5    doesn't look chronically ill even though she is.

6    Q.    Now, Dr. Newberger, based on your expert opinion, would

7    returning these two children to Canada subject them to a grave

8    risk of physical or psychological harm?

9    A.    Definitely, yes, in my opinion.

10              MR. PASTAN:  No further questions.

11                        CROSS-EXAMINATION

12   BY MR. BARACH:

13   Q.    Dr. Newberger, isn't it true that you never went to Canada

14   to view these children with their father?

15   A.    Yes.

16   Q.    And isn't it true, Doctor, that you never met with the

17   father of the parties' children?

18   A.    Yes.

19   Q.    And in most cases you attempt to interview the mother and

20   the father, both parents, correct?

21   A.    Where it's possible, yes.

22   Q.    In this case it wasn't possible to interview the father,

23   correct?

24   A.    Yes.

25   Q.    Did you ever ask to interview the father in this case?

1  A.   We talked about it.  I asked if he was going to be in

2  Boston at any point.  I learned that he couldn't leave Canada.

3  I would have very much liked to, but it was not possible.

4  Q.   And, in fact, you only met with these children once, on

5  January 15th --

6  A.   That's correct.

7  Q.   -- 2014?

8       And you met with them in your office, correct?

9  A.   I use my home as my office, yes.

10 Q.   Understood.  But you didn't meet them at the home of their

11 mother, right?

12 A.   That's correct.

13 Q.   And generally when you do a report such as this, isn't it

14 your preference to meet with the children and observe them in

15 their primary residence?

16 A.   Most times not.  So the answer is no, in general, but

17 where on occasion I do visit in homes, sometimes it does yield

18 information that's of great value.  But typically I see

19 children in an office setting.

20 Q.   Okay.  But it could be valuable to view them in their home

21 with their parent?

22 A.   Yes.

23 Q.   And isn't it true that you never reviewed the children's

24 medical records from Canada?

25 A.   To my knowledge efforts were made to get them but they

 1 | weren't available.
 2 | Q.   And you didn't review any medical records from Haiti of
 3 | these children?
 4 | A.   That's also correct.
 5 | Q.   And isn't it true that the Court did not appoint you as a
 6 | guardian ad litem, or neutral, in this case?
 7 | A.   That's correct.
 8 | Q.   And isn't it true that you've been asked to offer your
 9 | opinion today on behalf of the mother, correct?
10 | A.   Yes.
11 | Q.   And, Doctor, isn't it true in one of your submissions to
12 | the Court as an expert that you're concerned with the ethical
13 | standards of congregate care of children, correct?
14 | A.   Yes.
15 | Q.   And you're a board-certified child psychologist?
16 | A.   No, I'm a board-certified pediatrician; I'm not a
17 | psychiatrist.
18 | Q.   Okay.  So the submissions to the Court where it says
19 | you're a board-certified child psychiatrist would be incorrect?
20 | A.   Yes.
21 | Q.   And you didn't produce a written report in furtherance of
22 | your opinion today, correct?
23 | A.   That's correct.
24 | Q.   And it's true you no longer practice pediatric medicine?
25 | A.   No, I practice pediatric medicine.

1    Q.   And, Doctor, have you heard of St. Justine Hospital in

2    Canada?

3    A.   Yes.

4    Q.   And you've heard of Montreal Children's Hospital in

5    Canada, correct?

6    A.   Yes.

7    Q.   And, in fact, you're aware that Montreal Children's

8    Hospital in Canada is one of the world-renowned hematology

9    pediatric centers in this world.  Isn't that true?

10   A.   It's an excellent multispecialty academic hospital.  I

11   don't know whether it's world-renowned in hematology.

12   Q.   Well, in fact, sir, they have a special center that

13   provides comprehensive family care for children and adolescents

14   with cancer or benign hematologies.  Isn't that true?

15            MR. PASTAN:  Objection.

16            THE COURT:  You may answer the question.  If you know.

17            THE WITNESS:  I wasn't aware of it.

18   BY MR. BARACH:

19   Q.   And you're also aware that generally in the country of

20   Canada healthcare is generally free because it's socialized,

21   correct?

22   A.   It's my understanding that in general that's the case.

23   Q.   And isn't it true that you didn't review the children's

24   healthcare cards that they have in Canada, correct?

25   A.   That's correct.

1    Q.   And, Doctor, you reviewed RM's medical -- most recent

2    medical records from Boston Medical Center to formulate your

3    medical opinion that RM has a medical condition -- anemia, a

4    clotting disorder, correct?

5    A.   Well, there's a difference between anemia and a clotting

6    disorder.  Anemia refers to the ability of the red blood cells

7    to carry oxygen to the tissues of the body.  So anemia simply

8    means a low percentage of hemoglobin in their blood or a low

9    number of red blood cells when spun down in a centrifuge and

10   their percent of the blood measured.

11        But contrast, a clotting disturbance is a general term

12   that applies either to an insufficiency of platelets or an

13   insufficiency of various blood-clotting factors.  The latter,

14   it's my understanding, have been studied; the former, the

15   platelet insufficiency, is in the process of being finally

16   evaluated.

17   Q.   But you made your opinion on the lab reports that were

18   submitted from Boston Medical Center for RM, correct?

19   A.   Well, I want to be clear.  I'd seen the earlier lab

20   reports.  I did not see the lab reports associated with her

21   most recent visit in the records that I reviewed on January 10,

22   two weeks ago.  So there are additional chemical studies and

23   microscopic studies that are presumably available that I have

24   not reviewed.

25   Q.   Well, Doctor, in the records that you did review for your

1   report, isn't it true that RM's HCT level was 31.2, which is
2   within the normal range?  Isn't that correct?
3   A.   Yes, the HCT is the hematocrit.  That's the spun blood
4   that I talked about, the percentage of red blood cells in the
5   whole blood.
6   Q.   That's within normal range, correct?
7   A.   For the percentage of cells.  The problem is that these
8   are tiny cells and they're not sufficiently, how to put it,
9   energized with oxygen to feed her tissues.  And it's there that
10  there is seen an anemia.  Even though the hematocrit may be
11  within the normal range with regard to the percent of cells in
12  the whole blood, the difficulty is what's in those cells.
13  Q.   But, Doctor, 31.2 is within the normal range, correct?
14  A.   That's one among hundreds of blood studies.
15  Q.   Okay.  Well, let's look at the platelet count.  Her
16  platelet count on November 4, 2013, was 138, correct?
17  A.   It was 138,000, where you want to see that ten times that.
18  Q.   Well, Doctor, isn't 138 within the spectrum?
19  A.   No.
20  Q.   It isn't?
21  A.   No.
22  Q.   Okay.  Doctor, when would you recommend a platelet
23  transfusion for a child?  At what level of platelets would you
24  recommend it?
25  A.   Generally speaking, platelet transfusions are given for

1  children actively bleeding or at risk of actively bleeding.

2  It's determined by the clinical status of the child.  And --

3  Q.   Doctor, that's not my question.  It's a very simple

4  question.  What is the platelet count that you would recommend

5  for a platelet transfusion for a child?

6  A.   What is the word "platelet" --

7  Q.   The count?

8  A.   Are you saying pla- --

9  Q.   Platelet count.

10 A.   There is no numerical criterion for the platelet count at

11 which a platelet transfusion would be given.  It's a

12 combination of the child's clinical condition and of the

13 extreme low platelet count.

14 Q.   Doctor, you wouldn't give RM a transfusion?

15 A.   No, it's not at all required.

16 Q.   In fact, Doctor, isn't it true that the platelet count is

17 actually 50 or below that would require a transfusion?  Would

18 you agree with that?

19 A.   No, it's a question of both the platelet count and the

20 clinical urgency of the child's bleeding disorder, meaning

21 active bleeding or --

22 Q.   So --

23 A.   -- hemorrhage.

24 Q.   So you can't give me a number, can you?

25 A.   I'm saying it's not just the number, counsel.

1    Q.   Okay.  But you couldn't -- you wouldn't agree that -- if I

2    told you that every medical journal for surgeons and pediatrics

3    in Boston all agree that the platelet count is 150.  You'll

4    agree with that?

5          MR. PASTAN:  Objection.

6          THE WITNESS:  I'm saying it's a clinical indication --

7          THE COURT:  Wait a minute, Doctor.  You'll have to --

8          The objection is sustained to the form of the

9    question.

10   BY MR. BARACH:

11   Q.   My question is:  What would your -- in your medical

12   history what do you believe a -- a count of platelets would

13   require a transfusion in a minor?

14         MR. PASTAN:  Objection.  Asked and answered.

15         THE COURT:  Overruled.  You may answer it, Doctor.

16         THE WITNESS:  I want to be a little clearer in my

17   response.  A platelet transfusion is not a trivial procedure.

18   It's not done in a pediatric office; it's done in the confines

19   of a hospital, often on an inpatient basis under careful

20   monitoring.

21         And it's done, to my knowledge, and I'm not a

22   hematologist, only in situations where the clinical condition

23   of the child militates for its being done, and that is having

24   to do with the kind of illness that the child had that's

25   associated with the child's propensity to bleed and with regard

to the level of the platelets and of other blood factors that
can be compromised in the face of illnesses like hemophilia or
acute leukemia.  Those are the circumstances in which platelet
counts are done; it's not simply a numerical criterion.
BY MR. BARACH:
Q.    And none of those conditions --
A.    A numerical criterion.
Q.    Fair enough.  But none of those conditions that you just
described exist for RM, correct?
A.    Exactly.
Q.    Because, in fact, she has a minor anemia that can be
treated by vitamins, eating more meat, that is common in a
child of her age, correct?
A.    That is manifestly contrary to what the Boston Medical
Center records say and it is not at all what she needs.  It's
not yet evident whether the iron supplements that she's getting
are actually making a difference in her anemia.  It will take
time to discern that, and it's not just a question of more meat
or vitamins.
Q.    But certainly more meat and vitamins will help keep her
anemia under control?
A.    It's not at all certain that that's the case.  No,
absolutely not.  If you read the record, that's what the record
says.
Q.    But, in fact, the records prescribe more iron, correct?

1   A.   Yes, indeed.  And they want her to have a healthy diet.

2   But it doesn't lead to the cure that you're saying that it is;

3   otherwise, she wouldn't have to go back to the hematology

4   clinic for the close follow-up that she needs.

5   Q.   In fact, Doctor, according to the record on January 10,

6   2004 *[sic]*, she was prescribed to continue taking iron until

7   the next visit.  And that was to be in two months, correct?

8   A.   Correct.  They're following her closely.

9   Q.   And she doesn't need to be hospitalized right now?

10  A.   Correct.

11  Q.   And clearly this type of condition could be treated, as

12  you testified earlier, by a hospital such as Montreal

13  Children's Hospital in Canada, correct?

14  A.   Presumably so under the right circumstances.

15          MR. BARACH:  Nothing further.

16          THE COURT:  I have some medical records in the binder

17  that has been given me.  Are these the complete medical records

18  from the Boston Medical Center for these two children?

19          MR. PASTAN:  They are the ones that are complete as of

20  the day they are marked.  The blood panels that Dr. Newberger's

21  referring to that have not yet been processed are not part of

22  those because --

23          THE COURT:  How do I know what their information is,

24  then?  You mean -- I'm not clear what you mean by "not

25  processed."

1          MR. PASTAN:  Everything Dr. Newberger testified to is

2     included in the Boston medical records.

3          THE COURT:  I don't see any labs.

4          MR. BARACH:  The labs are near the end of L -- in

5     Exhibit L and Exhibit M.  They're a little bit hard -- it took

6     me a while to find it.  They start sort of in the last quarter

7     of L.

8          THE COURT:  I see.  They're separately --

9          MR. BARACH:  Yeah, there's two submissions from the

10    respondent.  One is L, which is RM's medical records from

11    Boston Medical, and the second is M, which is MM's medical

12    records from Boston Medical Center.  It's page 4 from the end.

13         THE COURT:  Okay.  And that's true -- that's just the

14    way the hospital packages them when it sends them out?

15         MR. PASTAN:  Yes, your Honor.

16         THE COURT:  I just have a couple of questions, Doctor.

17         I see in R's medical records, the commenter describes

18    the anemia as mild?

19         THE WITNESS:  Yes.

20         THE COURT:  Would you agree with that?

21         THE WITNESS:  Yes.

22         THE COURT:  And the treatment seems to be, at this

23    point -- again, I don't know whether I have the latest.  This

24    is a visit of December 12th.  The -- I guess the plan generally

25    is to follow.  Is that right?  Follow the patient, generally?

1          THE WITNESS:  Well, the last visit that I reviewed was

2     January 10.  The labs for that visit had not been posted in the

3     medical record at the time that Mr. Pastan got the records and

4     transmitted them to me.  But from the record it appears that

5     there is a persistent anemia.  They don't know yet whether it

6     has responded to iron supplementation therapy.  And this is

7     what's at issue.

8          Typically, a microcytic anemia in a girl this age, the

9     most prominent and frequent cause is iron deficiency and it

10    responds to iron treatment.  But it doesn't always.  And that's

11    what's at issue.  The child is still being evaluated.

12         THE COURT:  And it's still too early to tell.  Is that

13    correct?

14         THE WITNESS:  That's correct.

15         THE COURT:  Is it related to the nosebleeds?

16         THE WITNESS:  That's the idea.  This is a blood

17    dysplasia, meaning simply a blood disorder, but that's the term

18    that hematologists use, that involves two components which are

19    not commonly related to one another.  That's another component

20    of R's care that needs to be dissected and more fully

21    understood.  And that's why she needs to go to an expert

22    hematology service like the one at BMC.

23         THE COURT:  You referred to interviews that you

24    conducted with the mother, the aunt, and the two children, I

25    think.

1          THE WITNESS:  Yes.  The two children's interviews,

2    your Honor, were very, very brief.

3          THE COURT:  Were they mostly -- I don't know if this

4    is the way to describe it -- social rather than diagnostic?

5          THE WITNESS:  Exactly.  Correct.

6          THE COURT:  Yeah.  Is it -- how common is it to seek

7    to get reliable information from children this young?

8          THE WITNESS:  Actually, in the situation of child

9    sexual victimization involving a girl seven years old, it's

10   quite common to interview them systematically following certain

11   established guidelines such as those promulgated by the

12   American Academy of Pediatrics, the National Association of

13   Social Workers and so forth, but the thing is that you don't

14   want to have multiple evaluators do that.

15         It wouldn't, in my opinion, have been appropriate for

16   me to interview M myself because it could conceivably lead to

17   some confusion and obscuring in the yield of information that

18   she needs to give to a psychotherapist, and also -- I don't

19   know whether your Honor may have seen this, but plans are in

20   motion to have the child seen at the Suffolk County Child

21   Advocacy Center, which operates under the egis of the Suffolk

22   County District Attorney's Office, where they have specialized

23   staff who both interview children and assess the connection

24   between the children's disclosures, physical examination

25   findings, and then together with prosecutors, discern whether

1   or not there is actionable findings that require further

2   prosecutorial involvement.

3        So it's both a therapeutic process in that it can very

4   frequently uncover information of probative importance with

5   regard to the details of children's victimizations and can be

6   a prelude to a process that may ultimately protect a child.

7        MR. BARACH:  Your Honor, I'm going to move to

8   strike --

9        THE COURT:  No, it's denied because I'm interested in

10  hearing it.

11       So I gather that your decision was not to conduct an

12  interview that might interfere with either the therapeutic or

13  the perhaps --

14       THE WITNESS:  Precisely.

15       THE COURT:  Okay.

16       Anything else?

17       MR. PASTAN:  Nothing further.

18       THE COURT:  Anything else, Mr. Barach?

19       MR. BARACH:  Nothing further.

20       THE COURT:  Thank you, Doctor.  You may step down.

21       THE WITNESS:  Thank you.

22       (The witness is excused.)

23       MS. WARE:  The respondent calls Ann Christina Herisse

24  to the stand.

25       (Pause.)

1              NEKITA LAMOUR, duly sworn.

2         THE CLERK:  Please state your name for the record

3    again, please.

4         THE INTERPRETER:  Nekita Lamour, L-A-M-O-U-R.

5         THE CLERK:  Please raise your right hand.

6    ANN CHRISTINA HERISSE, duly sworn through the interpreter

7         THE CLERK:  Please state your name and spell your last

8    name for the record.

9         THE WITNESS:  Ann Christina Herisse, H-E-R-I-S-S-E.

10        THE CLERK:  Thank you.

11        THE COURT:  You may be seated, please.

12        THE WITNESS:  Okay.  Thank you.

13                     DIRECT EXAMINATION

14   BY MS. WARE:

15   Q.   Ms. Herisse, what city do you currently live in?

16   A.   Boston, Massachusetts.

17   Q.   And how do you know the parties in this case?

18   A.   Nathalie is my niece.

19   Q.   Do you have a close relationship with Ms. Herisse?

20   A.   Yes.

21   Q.   To your knowledge, were Ms. Herisse and Mr. Mauvais ever

22   married?

23   A.   No.

24   Q.   Were you ever invited to a marriage ceremony for

25   Mr. Mauvais and Ms. Herisse?

```
 1   A.   No.

 2   Q.   Has Ms. Herisse ever lived with you?

 3   A.   Yes.  Yes.

 4   Q.   When?

 5   A.   Now and before.

 6   Q.   When you say "before," can you tell the Court what years?

 7   A.   Before she had the baby.

 8   Q.   So around September 2009?

 9   A.   Yes.

10   Q.   And to your knowledge, why was Ms. Herisse in the United

11   States at that time?

12   A.   Because Haiti doesn't have doctors that can give -- where

13   she could deliver, so she came here to deliver the baby.

14   Q.   Do you remember when Ms. Herisse moved to Canada?

15   A.   Yes.

16   Q.   Did you have any concerns with her going there?

17   A.   A lot.  A lot.  Very much.

18   Q.   What were those concerns?

19   A.   I was very concerned because Belucci was very aggressive

20   sexually toward Mayenah.  And Manel, when he wasn't going to

21   get what he wanted, he was aggressive toward his wife.

22   Q.   How often did you communicate with Ms. Herisse when she

23   was in Canada?

24   A.   Many times.  About six times a day.  I was very concerned

25   with the relationship between Nathalie and Manel because I
```

1    would call sometimes and I couldn't find her, and I would call

2    people and I would ask, "Where is Nathalie?"

3    Q.   How many times would you say you were unable to find her?

4    A.   Especially at night.

5    Q.   Did you ever ask questions about why you couldn't get in

6    touch with her?

7    A.   I used to ask her, "Why don't I hear from you?  If I don't

8    hear from you, I become very concerned."

9    Q.   Were you ever aware of Mr. Manel interfering with

10   Ms. Herisse communicating with you?

11   A.   Yes, always.

12   Q.   What did you learn?

13   A.   Sometimes Manel will go to work with the phone so I will

14   not speak with Nathalie.

15   Q.   Did you ever visit Ms. Herisse and Mr. Mauvais in Canada?

16   A.   Yes.

17   Q.   Why?

18   A.   Because I was very concerned.  Nathalie was not having a

19   good life in Canada.

20   Q.   In 2013 did you ever go to Canada?

21   A.   Yes, I went to Canada.

22   Q.   Can you tell us what months?

23   A.   The month of August.

24   Q.   Why did you go in August of 2013?

25   A.   Okay.  Mayenah was concerned -- I was concerned about

1  Guevarnaie, because he had -- she had a nosebleed and there was
2  no doctor in Canada to take care of her.  And then she was
3  anemic also.
4  Q.   When you arrived in Canada, who was living in that house?
5  A.   Manel, Nathalie, and the four children.
6  Q.   Where did you sleep when you arrived?
7  A.   Usually when I go, they give me their bedroom to sleep and
8  they sleep in the living room.
9  Q.   Let's talk about August 26th, 2013.  Where were you on
10 that date?
11 A.   I was in Canada in their house.
12 Q.   Who was in the house with you on that day?
13 A.   Manel.  Nathalie went to a trip.  And so Manel was
14 sleeping on the couch and the kids were all over acting out,
15 running all over the house, and he was just sleeping.  So he
16 had no -- he wasn't aware of what the kids were doing, so I was
17 very concerned about that.  The kids were running around the
18 house and he's sleeping and he's not taking care of them.  I
19 was concerned about that.  And when it start time for him to go
20 to work, he gets up and he goes to work in the afternoon.
21 Q.   After Mr. Mauvais went to work, who was watching the
22 children?
23 A.   They stayed with me.
24 Q.   And what happened while you were watching them?
25 A.   I didn't hear from them.  So on my way back -- I was

1  getting ready to come back to Boston and I didn't hear from

2  them, so I was wondering where were they?  I went to the

3  bedroom very quietly, I saw Belucci with his penis in his hand,

4  and Mayenah was sitting in front of him looking at him.

5  Q.   You said you saw Belucci?

6          THE INTERPRETER:  Holding his penis in his hand.

7          THE WITNESS:  He was sitting naked with his penis in

8  his hand.

9  BY MS. WARE:

10  Q.   How close was he to Mayenah at this time?

11  A.   Mayenah was on the bed, was looking at Belucci, and

12  Belucci was very close to her.

13  Q.   Did you say anything or react?

14  A.   I didn't say anything.  I just stood there quietly.  And

15  all of a sudden he looked at -- he just looked and he went to

16  get some clothes to put on.

17  Q.   Had you ever seen Belucci -- BM interact with the children

18  at other times?

19  A.   When I go to Canada, I bring toys to the kids, and he's

20  always fighting so he could get the toys first.

21  Q.   How much longer did you stay in Canada after August 26th?

22  A.   Three days.

23  Q.   When you returned to the United States, did you take

24  anyone with you?

25  A.   Yes, I came with Guevarnaie so she could come to the

1    doctor.

2    Q.    When you say "Guevarnaie," is that the same as RM?

3    A.    Yes.

4    Q.    Now, when you arrived in the United States, were you able

5    to get RM medical attention?

6    A.    Yes, all of a sudden.  Yes, very quickly.  Very quickly.

7    Q.    When did you take RM to the doctor?

8    A.    When I came, I called to have an appointment as soon as

9    possible.  They said there was no time, so they gave me an

10   appointment for October.

11   Q.    Were you able to find out what is going on with Rhone's --

12   RM's health?

13   A.    Yes, they said she is very anemic.  She has to go to the

14   doctor's very often and they are sending her to a specialist.

15   Q.    Do you have any concerns about the children returning to

16   Canada?

17   A.    I'm very concerned about them going back to Canada because

18   Belucci is teaching Mayenah what to do, and Sathie is telling

19   Mayenah how to open her legs, and Manel is very aggressive

20   toward Nathalie.  So I'm like a mother to Nathalie.  I feel

21   like I represent Nathalie.  So I feel if she goes to Canada,

22   something could happen.

23            MS. WARE:  No further questions.

24            THE COURT:  Mr. Barach?

25                        CROSS-EXAMINATION

1  BY MR. BARACH:

2  Q.  Ma'am, isn't it true that you were required to return RM

3  back to Canada on or about September 20, 2013?

4  A.  Yes, I had to return her.  She had to go back.  But we

5  didn't have an appointment for her then, at that time, to see a

6  doctor.  And her nose was bleeding.

7  Q.  You haven't -- her nose isn't bleeding now, correct?

8  A.  Yes.  Yes, it bleeds every now and then.

9  Q.  And you still haven't returned RM to Canada, correct?

10  A.  What do you mean by that?

11  Q.  Well, you said you were going to turn her back after you

12  got -- you just testified you were going to return her to

13  Canada after she got medical treatment, correct?

14  A.  I didn't say that.  If I said that, I'm going to return

15  her back to Canada after she has medical treatment.

16  Q.  And you haven't returned her back to Canada, correct?

17  A.  No, I've not sent her because she has to go to the doctor,

18  and also, the child is with her mother.

19       MR. BARACH:  Thank you.  Nothing further.

20       THE COURT:  Anything else?

21       MS. WARE:  Nothing further from the defense, your

22  Honor.

23       THE COURT:  All right, ma'am.  Thank you.  You may

24  step down.

25       (The witness is excused.)

1       MR. BARACH:  Judge, I have a very quick rebuttal

2  witness, like five minutes.

3       THE COURT:  I have a phone call that I'm already 15

4  minutes late for.  If you want to wait, we can do it, but if

5  not, we can come back tomorrow morning.  Whichever.

6       MR. BARACH:  We could do it today if we waited?

7       MR. PASTAN:  Who's the rebuttal witness?

8       MR. BARACH:  She's on the witness list.

9       THE COURT:  Who is it?

10      MR. BARACH:  The niece.  She's on the witness list.

11      MR. MOORE:  We're happy to stay, your Honor.

12      THE COURT:  If you're content to stay, I can't tell

13  you how long it will be.  I think it will be at least 15

14  minutes now, or more, but if you want to hang around.

15      MR. BARACH:  All right.  Do you know what?  We'll

16  withdraw the request.

17      THE COURT:  Well, no.  Or the alternative is we could

18  do it tomorrow morning, continue in the case.  Whichever you

19  would want to do.

20      MR. PASTAN:  We would prefer to stay, your Honor, if

21  they wish to call a witness.

22      MR. BARACH:  We would prefer to stay.  I think it

23  wouldn't take longer than five, ten minutes.

24      THE COURT:  Okay.  So we'll do that and I'll try to

25  get back as soon as possible.

1          Let me just -- so you can be thinking about it, my

2    thought, then, was I'd have the evidence, I would give a period

3    of time for the submission of post-hearing briefs or requested

4    findings and so on, and then have you back for argument.  So we

5    won't have argument today; we'll just complete the evidence.

6          MR. BARACH:  Judge, may we submit findings of fact and

7    conclusions of law and a final argument by submissions?

8          THE COURT:  Yes, that's what I'm suggesting.  Then my

9    thought is to have argument on it after you've done that.  So

10   you might be thinking about the time period you want to do that

11   in, and we'll have to coordinate it with the calendar and so on

12   and so forth.

13         So we'll take a short recess.

14         THE CLERK:  All rise.  The Court will take a short

15   recess.

16         (The Court exits the courtroom and there is a recess

17   in the proceedings at 4:32 p.m.)

18         THE CLERK:  All rise.

19         (The Court enters the courtroom at 4:58 p.m.)

20         THE CLERK:  For a continuation of the motion hearing.

21   Be seated.

22         THE COURT:  Okay.  Thank you for your patience.

23         MR. BARACH:  Thank you, your Honor, for accommodating

24   us.

25         THE CLERK:  Who's your witness?

1    THE WITNESS:  Beverly Bernard?

2              BEVERLY BERNARD, duly sworn

3    THE CLERK:  Have a seat.  State your name, spell your

4    last name for the record, keep your voice up and speak into the

5    mic so the judge can hear you.

6         State your name for the record.

7    THE WITNESS:  Beverly Bernard.

8                   DIRECT EXAMINATION

9    BY MR. BARACH:

10   Q.   Beverly, can you state your address without the individual

11   street, where you live?

12   A.   1837 La Vallée Street.

13   Q.   And where is that?

14   A.   In La Vallée, Quebec.

15   Q.   And how old are you?

16   A.   Twenty-two.

17   Q.   And what do you do?

18   A.   I'm a student at Concordia University.

19   Q.   And what do you go to school for?

20   A.   To go to study human resources.

21   Q.   Do you know Manel Mauvais?

22   A.   Yes.

23   Q.   Do you know Nathalie Herisse?

24   A.   Yes.

25   Q.   Do you know Manel and Nathalie's daughters, RM and MM?

1   A.   Yes.

2   Q.   How do you know Manel Mauvais?

3   A.   He's my uncle.

4   Q.   How do you know Nathalie?

5   A.   His ex-wife.

6   Q.   And have you ever lived with Manel, Nathalie and their two

7   children, RM and MM?

8   A.   Yes.

9   Q.   When was this?

10   A.   From March 2010 to July 2010.

11   Q.   And how was your relationship with RM and MM?

12   A.   Really good.

13   Q.   How would you -- is it a close relationship?

14   A.   Yes.  They always come in my room and play with me.

15   Q.   Do you see them often?

16   A.   Yes.

17   Q.   And at a certain point in time when Nathalie, Manel and RM

18   and MM moved out of your house, where did they go?

19   A.   They go to their own apartment.

20   Q.   And do you know how long they stayed at their own

21   apartment?

22   A.   All together?

23   Q.   Approximately, if you know.

24   A.   Yeah.  Till winter 2011.

25   Q.   And what happened in -- at some point in the winter of

1  2011 did Nathalie and Manel separate?

2  A.  Yes.

3  Q.  And do you know where Nathalie went?

4  A.  She went to live with her stepmom and her two brothers.

5  Q.  And do you know where Manel -- did Manel stay in the same

6  apartment?

7  A.  Yeah.

8  Q.  And where did RM and MM go?

9  A.  They go with their mother.

10  Q.  And at some point did Nathalie and RM and MM move out of

11  the stepmother's apartment?

12  A.  Yeah.

13  Q.  Do you know when that was?

14  A.  No.  It was a few months after.  I just can't

15  remember -- a few months after she moved -- she left Manel.

16  Q.  Was it in the spring or the winter?

17  A.  More spring.

18  Q.  And do you know what year that was?

19  A.  2011.

20  Q.  And to your knowledge, after they left the apartment, at

21  any time did Nathalie and Manel and RM and MM ever live in the

22  same residence again?

23  A.  No.

24  Q.  And turning your attention to Exhibit B, the sworn

25  declaration that I opened for you, the address that is listed

1  for Nathalie, is that the address she was living in 2013?

2  A.   Yes.

3  Q.   And the address that is listed for Manel, is that the

4  address that Manel was still living in in 2013?

5  A.   Yes.

6  Q.   And these are not the same address, correct?

7  A.   No.

8  Q.   And how do you know they were never living together since

9  2011?

10  A.   Because I often go pick up the two twins who live with

11  Manel at Je Veux Boulevard (ph), the same address he's living

12  right now.  And when I go pick up Mayenah and Rhone, I go pick

13  them up on Antonio Avenue (ph), where Nathalie was living.

14  Q.   So you're certain in 2013 Manel was not living with

15  Nathalie?

16  A.   Yes.

17  Q.   And was Manel living with his new wife?

18  A.   Yes.

19  Q.   And was RM and MM living with Nathalie?

20  A.   Yes.

21  Q.   And that was in a separate residence than your uncle's

22  residence?

23  A.   Yes.

24  Q.   Did you ever baby-sit for RM and MM?

25  A.   Yes.

1  Q.   Did you observe the relationship between Manel's children,

2  the twins, and RM and MM?

3  A.   Yes.

4  Q.   How would you describe that relationship?

5  A.   Very good.  Especially the girls together.  They like to

6  play Barbies and all the toys they can find.

7  Q.   And did you have occasion to baby-sit for RM?

8  A.   RM?

9  Q.   Uh-huh.

10  A.   Yes.

11  Q.   And how often?

12  A.   Pretty much every weekend when my mom is not there.

13  Q.   And during your care of Rhone, did she ever develop a

14  nosebleed that wouldn't stop bleeding?

15  A.   No, never.

16        MR. BARACH:  Nothing further.

17        MS. WARE:  No questions for this witness, sir.

18        THE COURT:  All right.  Thank you very much.  You may

19  step down.

20        (The witness is excused.)

21        THE COURT:  Okay.  Have you talked about a time frame

22  for briefing?

23        MR. PASTAN:  Yes, we have, your Honor.

24        MR. BARACH:  Yes, Judge.  We were talking about

25  February 11 for findings of fact and conclusions of law, and

1  we're at your mercy for what --

2          THE COURT:  That's fine.  Well, I think what we'll do

3  is we'll look at them when they come in and we'll set a date

4  that's appropriate after we've looked at them.

5          MR. BARACH:  Judge, one other preliminary issue.  I

6  would just ask that the temporary order be extended.

7          THE COURT:  Yes, we'll continue the preliminary

8  injunction or temporary order through the resolution of the

9  matter.

10          MR. BARACH:  Thank you, your Honor.

11          THE COURT:  Okay.  In terms of scheduling, any

12  academic calendar issues?

13          MR. BARACH:  Just not February vacation week.

14          THE COURT:  Okay.  No?  Okay.  Thank you all.

15          MR. PASTAN:  Thank you, your Honor.

16          THE CLERK:  All rise.  Court will be in recess.

17          (The Court exits the courtroom and the proceedings

18  adjourned at 5:05 p.m.)

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3            I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

 4      the United States District Court, do hereby certify that the

 5      foregoing transcript constitutes, to the best of my skill and

 6      ability, a true and accurate transcription of my stenotype

 7      notes taken in the matter of Civil Action No. 13-13032-GAO,

 8      Manel Mauvais v. Nathalie Herisse.

 9

10      /s/ Marcia G. Patrisso
        MARCIA G. PATRISSO, RMR, CRR
11      Official Court Reporter

12
        Date:  4/28/14
13

14

15

16

17

18

19

20

21

22

23

24

25
```